No. 3403

Second Circuit

SMITH v. LOUISIANA & ARKANSAS RY. CO.

(March 12, 1929.   Opinion and Decree.)
(April 5, 1929.   Rehearing Refused.)

Thos. W. Robertson and John G. Gibbs, of Shreveport, attorneys for plaintiff, appellee.

A. L. Burford, of Texarkana, and White, Holloman and White, of Alexandria, attorneys for defendant, appellant.

ODOM, J.   This is a damage suit, arising out of injuries which plaintiff sustained in a collision between his automobile and a freight train operated by defendant company, at a point where defendant's line of railroad crosses the Shreveport-Minden public highway on the extreme eastern edge of Bossier City.

Plaintiff alleges that he was traveling east on the highway at a moderate rate of speed, and that on said crossing defendant's train collided with his automobile, damaging it and seriously injuring him. He disclaims negligence on his own part and assigns as negligence on the part of the defendant company that its train approached a "blind crossing" at an excessive and unlawful rate of speed, without the sound of bell or whistle, and that the engine which was pulling the train had its front end attached to the train and was running backwards; and further, that the defendant company maintained no watchman at the crossing.

Defendant, in answer, denied any act of negligence on its part, and alleged that it approached the crossing at a moderate rate of speed, with bell ringing, and that the whistle was blown; that it had a lookout on the forward end of the engine, and that, as it approached the crossing, plaintiff, running his automobile at an excessive rate of speed, without stopping, looking or listening, attempted to cross the track ahead of the train and ran into the corner of the tender; and further, that the crossing is not a "blind crossing," and that it was not necessary or customary to maintain a watchman there, and that said accident was due solely to the negligence of plaintiff.

Upon plaintiff's application, the case was tried by a jury. There was verdict and judgment for plaintiff, and defendant has appealed.

OPINION.

The Shreveport-Minden highway, from where it leaves the traffic bridge over Red River, runs due east and west through the town of Bossier City, and is 100 feet wide up to the railroad crossing. The defendant company's line of railroad crosses the river some distance south, or down the river from the traffic bridge, and runs northeast, crossing the highway about 200 feet west of the eastern limits of the town. Along the right-hand side of the highway going east, there are houses up to a point within 700 feet of the crossing which obstruct one's view of defendant's track. Along this stretch of 700 feet, before reaching the crossing, there was at the time of this accident in June, 1924, only one building—a filling station, which stood adjacent to and fronting the highway. This building, it appears, was 40 feet wide, with its east wall 167 feet west of the crossing. Between this filling station and the near-

est house, west, back towards the river on that side of the highway, there is an open space of 414 feet. One standing on the highway at any point along this 414-foot stretch, has an open and unobstructed view of defendant's line of railroad from where it crosses the river to the highway crossing—a distance of about one-half mile—except that which was obstructed by the filling station. The east edge of the filling station was 167 feet from the crossing. Passing the filling station, going east towards the crossing, the view of the railroad was partially obstructed by an advertising signboard, 10 by 20 feet, either on or near the railroad right-of-way, and by some empty oil barrels stacked between the highway and the railroad. The testimony does not enable us to locate precisely the position of the signboard or the barrels, but they were on the right-hand side of the highway and between the filling station and the crossing. However, it is clear that these obstructions did not cut off the view of the railroad from the highway all along this distance of 167 feet between the filling station and the crossing, so that, if one going east on the highway, after passing the filling station, had looked to the right in the direction of the railroad track, he could have seen portions, at least, of the track.

The railroad right-of-way at the crossing is 100 feet wide, 50 feet on each side of the track. Some of the witnesses say that one standing on the highway at the edge of the right-of-way, at the crossing 50 feet from the track, on looking to the right would have a clear, unobstructed view of the track back to the railroad bridge. But plaintiff himself says that this unobstructed view could not be had until a point 30 feet from the track was reached.

There was a fence along the right-of-way

and some weeds about three feet high, but these did not obstruct the view.

At about ten o'clock on the morning of June 9th, plaintiff was driving east on the highway. At the same time, defendant's train, 650 or 700 feet long, consisting of 16 box cars, engine, tender and caboose, was moving northeast on its track. The engine was in front of the train, but had its front end attached to the train so that the tender was·ahead. Plaintiff's automobile and the tender of the engine reached the crossing at about the same time—hence, the collision.

The testimony on some points is conflicting as is usual in cases of this kind. But there is one point on which there is no conflict, and that is that plaintiff did not stop before going upon the track. Plaintiff himself, as well as every other witness who took the stand, swore that he did not stop. Plaintiff's account of the accident is that he looked to the right after passing the filling station, and that he looked all the time until he reached the crossing; that he heard nothing and did not see the train until his front wheels were on the track; that he was driving about 10 or 15 miles an hour, until he saw that a collision ·was inevitable, then he swerved to the left and "speeded up" to cross ahead of the train; that he got almost across· but the right corner of the tender struck the rear end of his car. He says the car he was driving was a new Buick, equipped with four-wheel brakes, and that at the speed he was going, he could have stopped it easily in five or ten feet, and again, he said he could have stopped easily in five feet. As to when he saw the train, we quote his testimony at page 52 of the record:

"Q. When you got on the track you saw this car lunge right out before you?
"A. My front wheels on the track and the cow catcher right here and that is the first thing, first time I saw the train or heard it—I figured if I stopped it would hit me in the middle of the car and so the best thing to do was to go with it, I gave it the juice and started with it down the track, figured could outrun it to the other side and get by.

\* \* \*

"Q. You were looking at the time as you were driving?
"A. Sure.
"Q. Looking up that track the whole time?
"A. Yes, sir, looking all the time.
"Q. You were looking all the time?
"A. Bet your life, I have been a very careful driver."

We do not get the impression that plaintiff intended to convey the idea that his view of the track was so obstructed that he could not see the train. On being asked if he stopped, he said:

"A. No I didn't, didn't think it necessary to stop, could not. see anything or hear anything, figured the way was clear, few little bushes about like that along there, (indicating three feet high) \* \* \*
"Yes, sir, little taller than the table, I looked down that way, didn't see a thing in the world, clear spot between the filling station and where those barrels and things were piled and that signboard."

We are not impressed with plaintiff's statement that he did not see the train until his front wheels were on the track, because the highway is 100 feet wide there, and he was driving on the right-hand side, and the collision took place over on the extreme left-hand side of the highway; when hit, his car had almost cleared the track ·and was struck on the rear right-hand side. It is plain enough, we think, that he began to swerve his car to the left before he reached the track for he crossed the highway from the right to the left-hand side. If he had turned to the left after reaching the track, he would have run on the track until overtaken and would have been hit from the rear. It is

more probable, we think, that he saw the train before he reached the track and, either underestimated the speed of the train or overestimated the speed of his car, and, as he puts it, "gave it the juice" and "speeded up" in the hope that he could cross ahead of the engine.

Mr. Calcote, a witness called by plaintiff (p. 26), testified that there was nothing to keep plaintiff from seeing the train before he got to the filling station, as he had a clear view of the track, and as to whether he could see the track and train after passing the filling station, he was asked:

"Q. Then after passing your (filling) station he had a view of the track?
"A. Yes. * * *
"Q. After he passed the signboard and barrels he had about 30 feet more before reaching the railroad?
"A. Yes."

And he said after getting to within thirty feet of the track, plaintiff had a clear view of the track back to the river. The testimony clearly shows that portions of the track are visible from the highway after passing the filling station before getting to the barrels or signboard; in other words, there were open spaces through which plaintiff could have seen the train moving, if he had looked.

The above is testimony given by plaintiff and his own witnesses, and this testimony as to the view of the track is corroborated by all the witnesses, both for plaintiff and defendant. It follows necessarily that if plaintiff had looked, he could have seen the train. The conclusion is, therefore, inescapable that if he did not see the train, he did not look. He says he did not see it, and he and all of the witnesses say that he did not stop.

The duty to stop, look and listen before attempting to negotiate a railroad crossing is one of universal recognition. In the case of Baltimore & Ohio vs. Goodman, Administratrix, (C.C.A.), 10 Fed. 2 Ed., page 58, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 569 A. L. R. 645, Justice Holmes, organ of the Court, speaks of that duty as a "standard of conduct." He said:

"But we are dealing with a standard of conduct, and when the standard is clear, it should be laid down once for all by the Courts."

We quote the following from that decision:

"When a man goes upon a railroad track, he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train, not the train stop for him. In such circumstances it seems to us that if the driver cannot be sure otherwise whether a train is dangerously near, he must stop and get out of his vehicle, although obviously he will not often be required to do more than stop and look. It seems to us that if he relies upon not hearing the train or any signal, and takes no further precaution, he does so at his own risk."

The duty to stop at railroad crossings has been modified by our own Supreme Court to this extent only; that when one approaching a railroad crossing, has a clear view of the track, and can ascertain without stopping that the way is clear, he need not come to a dead stop. In the case of Holstead vs. Vicksburg, Shreveport & Pacific Ry. Co., 154 La. 1097, 98 So. 679, the Court said:

"If one can see that his way is clear sufficiently, under reasonably normal circumstances to pass without danger, he is justified in going ahead; or if, as in this case, the view is obstructed, he should approach cautiously until a view may be had."

As to the duty to stop, look and listen, see:

Young vs. Louisiana Ry. Company, 153 La. 129, 95 So. 511; Douall vs. N. O. Railway & Light Company, 147 La. 1012, 86 So. 477; Leopold vs. Texas & Pacific Ry. Company, 144 La. 1000, 81 So. 602; Gibbens vs. N. O. Terminal Company, 159 La. 347, 105 So. 367; Callery vs. Morgan's Louisiana & T. R. & S. S. Company, 139 La. 763, 72 So. 222.

The plaintiff was guilty of the grossest kind of negligence, and, if it be conceded, as he alleged, that the defendant company was negligent in the operation of its train, his own contributory negligence bars recovery, if such negligence was the main contributing cause of the accident.

Young vs. Louisiana Western Ry. Company, 153 La. 129, 95 So. 511; Callery vs. Morgan's Louisiana & T. R. & S. S. Company, 139 La. 763, 72 So. 222, supra; and Loftin vs. Louisiana Ry. & Navigation Company, 135 La. 33, 64 So. 972.

However, we do not find that the railroad company was negligent. This was not a "blind crossing," and there is no ordinance or regulation requiring the railroad company to keep a flagman or to stop there; and, while the witnesses for plaintiff testified that they did not hear the bell or whistle, the testimony of other witnesses who are positive on the point has convinced us that, as a matter of fact, the whistle was blown and that the bell was ringing. Some of the witnesses for plaintiff testified that they were about their business at the time and did not hear the crossing signals. But all those witnesses, and there were a number of them, whose duty and business it was to watch the crossing were positive on the point. We refer especially to the train crew of the Kansas City Southern, each member of which testified that its line of railroad crossed that of the defendant company within a short distance of the highway crossing, and that it was the rule in cases where there was a train approaching the railroad crossing on each line of railroad, the right-of-way was given to the one which signaled first, and that the Kansas City Southern train was stopped before reaching the crossing on account of the signal given by defendant. These witnesses were in plain view of the highway crossing at the time of the accident and some of them saw it. At least four members of defendant's train crew testified positively that the whistle was blown and that the bell was ringing. The verdict of the jury and the judgment based thereon are manifestly erroneous.

For the reasons assigned, the judgment appealed from is reversed, plaintiff's demands rejected, and this suit dismissed, at his cost.