No. 3210

Second Circuit

WASHINGTON v. Y. & M. V. R. R. CO.

(November 18, 1929. Opinion and Decree.)

· Thatcher, Browne, Porteous & Myers, of Shreveport, attorneys for plaintiff, appellant.

Wise, Randolph, Rendall & Freyer, of Shreveport, attorneys for · defendant, appellee.

REYNOLDS, J. Plaintiff sustained bodily injuries in a collision between a motor truck on which he was riding and a train of freight cars owned and operated by defendant, and he seeks by this action to recover judgment for damages.

The collision occurred on July 19, 1926, where Velva Street crosses defendant's railroad, in the city of Shreveport, Louisiana. The crossing is at grade.

Plaintiff alleges that the collision was caused solely by defendant's negligence in that (1) the train was moving at more than six miles an hour in violation of an ordinance of the city limiting the speed of trains within the city limits to six miles an hour; (2) the engineer in charge of the locomotive had the last clear chance to avoid the collision and failed to avail himself of it; (3) a flagman or mechanical warning signal was not stationed at the crossing to give notice of the approach of trains; (4) no bell was rung, nor (5) whistle blown as the train approached the crossing; (6) the train was not stopped nor its speed brought under control just before the crossing was reached; (7) one of the train crew was not sent ahead of the train to flag its approach at the crossing.

The answer of the defendant was a denial of the negligence charged and an allegation that the sole cause of the accident was the negligence of plaintiff and the driver of the truck on which he was riding.

On these issues the case was tried and there was judgment rejecting plaintiff's demands and dismissing his suit and he has appealed.

### OPINION.

Velva Street runs north-south. The truck on which plaintiff was riding was uncovered and was being driven north on Velva Street by one Oliver. It was loaded with furniture and plaintiff's duty was to "tend" the furniture.

The railroad crosses Velva Street in a northeasterly-southwesterly direction at an angle of about 45 degrees.

About one o'clock in the afternoon a train, made up of fourteen cars, eleven of which were loaded, and a locomotive, was moving southwesterly. On its way it crossed Claiborne Avenue, which is one block from Velva Street in the direction from which the train was coming. It

stopped and blew the whistle just before crossing Claiborne Avenue. The bell was ringing all the while the train was moving.

The driver of the truck, Oliver, was not called as a witness.

The plaintiff testified, on direct examination:

"Q. Did you hear that train coming?
"A. No, sir; did not know it was coming.
"Q. Was any bell rung or whistle blown?
"A. I didn't hear any.
"Q. When was the first time that you heard the train?
"A. After the accident. I didn't hear it. I didn't see it. I could not see it from where I was standing. I was in the body of the truck, holding the furniture. Had two or three dressers in there.
"Q. In what direction were you facing?
"A. I was facing the way we were going, and holding the dressers.
"Q. The train came in from your right?
"A. Yes, sir.
      *    *    *    *    *    *    *
"Q. How fast was that truck going?
"A. I guess it might have been going fifteen or eighteen miles an hour.
"Q. When the train struck the truck, what happened?
"A. It knocked the furniture and everything, myself and the furniture, out of the truck; bruised me all up in here (indicating). I did not see the train until after I came to, when they picked me up and put me in the truck; I didn't know what hit me.
      *    *    *    *    *    *    *
"Q. This furniture which stood up was about how high? How high was that furniture?
"A. Some was higher than my head.
"Q. That was in front of you?
"A. Yes. I was standing on the truck, holding the dresser.
      *    *    *    *    *    *    *
"Q. The side the train was coming from, was that dresser between you and that, higher than your head?
"A. Yes, sir; had a mirror in it."

J. P. Bonar testified that he was the engineer in charge of the locomotive and that he was sitting on the right-hand side of the cab in the direction the train was moving and that this was on the south side of the track; that he first saw the truck when it was forty or fifty feet from the track and the locomotive about twenty feet from Velva Street. The locomotive was being operated with its tender or tank ahead or to the front. That the throttle was shut off and the engine drifting. He blew the signal for the crossing, and as the truck continued to move toward the track he applied the brakes, and the locomotive stopped with its head on the crossing. From the time the train left Claiborne Avenue until the brakes were applied its speed was between four and five miles an hour. The left-hand side of the locomotive struck the truck between its front and back wheels. The force of the impact was not sufficient to overturn the truck. A brakeman named Shep Jackson was riding on the foot-board at the head of the locomotive, and at the same moment that the witness first saw the truck he saw Jackson jump from the foot-board to the ground and throw his hands down in warning of danger of collision.

Shep Jackson testified that he was a brakeman on the train and was stationed on the foot-board at the front of the locomotive. That the train had stopped at Claiborne Avenue and its speed after it started again until the accident was between four and five miles an hour. On approaching Velva Street the crossing whistle was blown. He first saw the truck when it was about thirty feet from the railroad and that at that time the locomotive was about twenty feet from Velva Street. As soon as he saw the truck he shouted and waved

his arms to the driver of it and at the same time jumped to the ground, feeling as he left the locomotive, the jar consequent on the application of the brakes to it. The bell was ringing as the locomotive approached Velva Street and had been ringing as long as the train was in motion.

He further testified:

"Q. Didn't the auto slacken its speed as it approached you?
"A. No sir.
"Q. How fast was it travelling?
"A. I estimate it was going ten or fifteen miles an hour, I reckon."

J. R. Harris and R. O. Williams were riding in an automobile and crossed the railroad at Claiborne Avenue just ahead of the train and drove around into Velva Street and stopped on the right-hand side of that street immediately north of the railroad before the train reached Velva Street.

Harris testified:

"Q. Had you any occasion to hear or see the train before it reached that point?
"A. I saw it at Claiborne Avenue; drove across ahead of it.
*    *    *    *    *    *    *
"Q. You heard the train as it started up across the crossing at Claiborne Avenue?
"A. Yes, sir, about the time I crossed.
"Q. What signals were given?
"A. I think they blew two long and short, maybe.
*    *    *    *    *    *    *
"Q. What other signals were being sounded?
"A. The bell was ringing.
"Q. Did you hear the bell ringing any after that time?
"A. Yes, sir.
"Q. How long?
"A. We ran on down to Velva Street and stopped just before getting to the railroad, and after stopping they came on, and we were sitting there talking and they

were coming and we could hear it; I didn't hear it all the way round, but when we stopped I heard the bell ringing.
"Q. Before it got to Velva Street?
"A. Yes, sir.
"Q. Did you see that train as it approached?
"A. Yes, sir.
"Q. What would you say as to its speed?
"A. I don't know; it couldn't have been running very fast, I guess five miles an hour.
"Q. Did you see the truck before it got to the crossing?
"A. Yes, sir.
"Q. How far back down?
"A. Seventy-five or eighty feet.
*    *    *    *    *    *    *
"Q. About how fast was it coming?
"A. He was going twelve or fifteen miles an hour.
"Q. Did he stop or slow down after you saw him?
"A. No, sir; he was leaning on the curb, sighting it on down.
*    *    *    *    *    *    *
"Q. And you could see he was going to hit the train?
"A. I figured it that time; you can figure it that way. It is about right, I guess.
"Q. How far was it (the locomotive) up the track when the man was seventy-five feet away?
"A. I could not tell you.
"Q. That was when you first noticed there was going to be an accident?
"A. I seen the driver—of course there is a house there and of course the train was coming—and I told Mr. Williams, watch that fellow run in front of the train. He was not even looking. Never looked when it hit. Didn't look up.
*    *    *    *    *    *    *
"Q. Was there anything to attract your attention when this man was seventy-five feet away?
"A. The train was coming.
*    *    *    *    *    *    *
"Q. When he was seventy-five feet away, was it sure that an accident was going to happen?
"A. I thought there would, because he didn't cut off his engine; he was looking the other way.

"Q. When you first saw him coming out there, he was in no position to see the train, was he?

"A. He could see at any time he wanted to. The house was small, and there was an open space before he got to the house. He could see it if it (meaning the train) was there, and hear the bell.

❖ ❖ ❖ ❖ ❖ ❖ ❖

"Q. You could tell, when it was seventy-five feet away, there was going to be an accident?

"A. I could tell. Could tell, the way the man was going.

"Q. You could tell?

"A. Yes, sir. Could have stopped, if he had seen it."

Williams corroborated Harris' testimony. He was asked:

"Q. Did you see anyone on the approaching or front end of the foot-board?

"A. A negro brakeman; I reckon it was a brakeman—a negro.

❖ ❖ ❖ ❖ ❖ ❖ ❖

"Q. What did he do as he got pretty close there?

"A. Jumped before the train hit the truck; jumped off."

Two witnesses called by plaintiff, Fall Gray and H. S. Roberts, gave it as their opinion, on direct examination, that the train was moving at a speed of from twelve to fifteen miles an hour, but, on cross-examination, admitted that they were not paying particular attention to the speed and were at work up to the time of the accident and that their estimate of the speed was merely guess.

In our opinion the preponderance of the evidence clearly establishes that the speed of the train did not exceed six miles an hour and that the bell was continuously ringing all the while it was moving.

In respect of the blowing of the whistle, an ordinance of the city introduced in evidence forbids the blowing of locomotive whistles within the city limits, and Velva Street is within those limits. Had the whistle not been blown the omission would not have been negligence, as it is not negligence to obey a city ordinance. However, there is abundant proof in the record that the whistle was blown, notwithstanding the ordinance forbidding it.

No ordinance of the city or rule of the defendant required that a flagman or mechanical device to warn of the approach of trains be stationed at the crossing, or required the train to stop before crossing the street, or move at a slower speed than six miles an hour, or that one of the train crew be sent ahead of the train to flag the crossing; and in the absence of such ordinance or rule the omission to do these things was not negligence.

Neither do we think the last clear chance to avoid the accident lay with the engineer. Though this contention is not pressed in brief by counsel for plaintiff we have examined the evidence in support of it and our conclusion is that it is unfounded. The truck was moving rapidly and before the engineer could know that it would not stop before attempting to cross the track it was upon the track and the locomotive too close to it for the train to be stopped before striking the truck.

The mere happening of the accident did not raise a presumption of negligence on the part of defendant.

Cook vs. Railroad Co., 130 La. 917, 58 So. 767.

Negligence is a breach of a legal duty. It will not be presumed, and the burden of proving it rests upon him who asserts it.

Meyers vs. Cypress Co., 118 La. 811, 43 So. 448.

A person is not negligent in failing to anticipate that another person will be negligent.

Ford vs. Tremont Lumber Co., 123 La. 742, 49 So. 492, 22 L.R.A. (N. S.) 917, 131 Am. St. Rep. 370; Damonte vs. Patton, 118 La. 530, 43 So. 153, 8 L.R.A. (N. S.) 209, 118 Am. St. Rep. 384, 10 Ann. Cas. 862.

Plaintiff's counsel has cited many cases holding railroad corporations liable for collisions caused by backing trains. The locomotive attached to the train here was at the head of the train and the train was not backing. Therefore the authorities cited have no application to the case at bar. And the fact that the tender or tank of the locomotive was ahead rather than the smokestack and boiler is not of any consequence, as that fact in no way contributed to cause the accident.

The driver of the truck, instead of stopping and looking and listening before attempting to cross the railroad, attempted to drive across the tracks at a speed which plaintiff himself testified was from fifteen to eighteen miles an hour, thereby putting the truck on the tracks in front of and so close to the locomotive that it was impossible for the engineer to stop the train before striking the truck; and this we think was the sole cause of the accident.

The evidence convinces us that the collision occurred without any fault or negligence on the part of the defendant.

The judgment appealed from is correct and it is affirmed.