## IGLESIAS v. CAMPBELL.*
### No. 5324.

Court of Appeal of Louisiana. Second Circuit.

Oct. 30, 1936.

*Rehearing granted Dec. 11, 1936.

J. G. Palmer, of Shreveport, for appellant.

Hendrick & Hendrick, of Shreveport, for appellee.

HAMITER, Judge.

While George Iglesias, a child four years of age, was walking across Texas avenue at its intersection with Jordan street in the city of Shreveport, about 7 o'clock of the evening of November 29, 1934, he received injuries when struck by an automobile driven by Jack Campbell, the minor son of the defendant herein. The injured child at that time was accompanying and in the custody and control of his father, the plaintiff herein, and his mother.

As a result of the accident, plaintiff brought this suit to recover damages for the use and benefit of his minor son in the amount of $5,500, and in his individual capacity the sum of $150.

Numerous acts of negligence are charged in the petition to the driver of the car. It is also alleged that at the time of the accident said driver was the unemancipated minor son of the defendant, that he resided with and was under the control of his father, and that he was driving defendant's car. In his answer, defendant denied that the driver was negligent in any manner, denied responsibility for any damage caused by his son, even if it be found that he was negligent, and alternatively averred contributory negligence on the part of plaintiff and his wife and that such negligence was imputed to their child.

From a judgment in favor of plaintiff in his individual capacity for $30, and in the amount of $300 for the use and benefit of the injured child, defendant prosecuted this appeal. An answer to the appeal filed by plaintiff asks for an increase in the amount awarded to not less than $5,000.

No mention has been made by counsel, either in argument or written briefs, of the issue created by defendant's denial that he was responsible for any damages occasioned by his son, even if negligence be found, and we shall treat that issue as having been abandoned.

For the purpose of the trial of this case, it was agreed that, at the intersection where the accident occurred, Texas avenue runs north and south and Jordan street runs east and west. Both arteries of traffic are paved. In this discussion, in order to avoid confusion, we shall refer to Jordan street on the east side of Texas avenue as East Jordan, and on the west side thereof as West Jordan.

As revealed by the record, Texas avenue is 56 feet in width. East Jordan is 42 feet wide, while West Jordan has a width of only 24 feet. This reduction or difference of 18 feet between East and West Jordan streets appears to be equally distributed on both sides of West Jordan, and is responsible for the end of the sidewalk on the north side of West Jordan being diagonal and in a southwesterly direction from the end of the sidewalk on the north side of East Jordan. In other words, a continuation of the north sidewalks of the two portions of Jordan street would not result in their uniting.

A double street car track travels west on East Jordan to and turns right onto Texas avenue and continues in a northerly direction on Texas avenue toward the principal business district of the city of Shreveport, and vice versa.

North of the intersection, there existed at the time of the collision a safety lane which was marked off by the Shreveport Safety Department. It was 16 feet in width, and traversed and was perpendicular with Texas avenue. This lane was established during the latter days of October, 1934. Its south line, or the one nearest the intersection, was 27 feet from the northeast corner of the intersection, and 18 feet from the north line of the sidewalk on that corner, while such line was 35 feet from the northwest corner of the intersection, and 26 feet from the north line of the sidewalk on that corner.

A manhole, used for gaining access to underground public utility equipment and possessing an iron lid, was located in the west half of Texas avenue about 23 feet south of the south line of the safety lane.

In the center of the intersection there hung an electric semaphore signal device installed and maintained for the purpose of directing traffic at that location. It had the customary three lights of green for go, amber for caution, and red for stop.

On the evening of the accident, plaintiff, his wife, and minor son, descended from a street car, which was traveling toward the business section of the city, when it stopped at a point on the north side of East Jordan just prior to its entrance into the intersection. A journey was then made by them on foot toward the north sidewalk of West Jordan street. It is not clear whether they commenced this crossing from the point in East Jordan street where they alighted, or from the north sidewalk of that street to which they might have gone, but a decision of this controversial fact is not necessary, as will hereafter appear. It is certain that they did not proceed to and were not traveling in the above-described safety lane which is designated for pedestrian use. The destination of plaintiff and his family was the home of relatives which was located on a street that intersected West Jordan street several blocks west of the place of accident.

After these parties had crossed the east half of Texas avenue and had reached a point in the west half thereof, nearly opposite the north sidewalk on West Jordan, about 5 feet southeast of the manhole and approximately 28 feet south of the south line of the safety lane, the minor son was struck and injured by the left front fender of defendant's car.

Immediately preceding the collision, defendant's son was driving the car south on Texas avenue, and beside him on the front seat were his passengers and guests, Miss Dollie Lloyd and Mr. Warfield Ward. All of these parties were small in stature, and it does not appear that the driver was handicapped in his driving by reason of the three being on the front seat. They were on their way to the home of Miss Lloyd, who lived in the south portion of the city, and the driver planned to turn left off Texas avenue into East Jordan. The driver approached and entered the safety lane and intersection at a speed of approximately ten miles per hour, and proceeded to the point of accident at the same reasonable rate of speed. The car was stopped within a distance of 4 feet after hitting the child.

The only eyewitnesses to the accident were the pedestrians above named and the occupants of the car. Plaintiff and his wife testified that the semaphore signal displayed a green light when they commenced the crossing of Texas avenue.

The testimony of the driver and his guests was that as they approached the intersection, the signal lights changed respectively from red to amber to green, and that they entered the safety lane and intersection on the green light. None of this testimony is disputed. It is possible and quite probable that all parties entered on the signal "go." Texas avenue is comparatively a wide thoroughfare. Plaintiff and his wife were walking, and if the green light facing East Jordan had ceased shortly after they began their crossing, the green light could have appeared on the Texas avenue side before they reached the accident location. In considering this case, therefore, we shall assume that all parties concerned entered the intersection on their respective traveling missions while proper signal lights were displayed.

The accident occurred after dark, and during a sprinkling of rain, but the street lights, as well as the headlights of the car, were burning. The record does not disclose that there were other automobiles or any obstructions in or near the intersection.

The pedestrians were not seen by the driver until after the child was struck, his testimony being that he was looking straight ahead and that he saw no one until Mr. Ward called to him to look out. With reference to this matter of calling, Ward gave an affirmative answer to the following question: "You three were carrying on a conversation and you happened to look up and see these people standing in the street about three or four feet away from you and you holloed to Jack, is that your testimony?" Miss Lloyd, the other passenger, was conversing with Ward, who was seated on her right, and she did not see the pedestrians until after the accident occurred.

An account of the accident, as given by plaintiff and his wife, is that they, with their son, were walking abreast, the father being on the right, or toward the car, the mother in the center, and the child, whose hand she held, was on her left. The car, which they saw when about 10 feet away, began a left turn into East Jordan without giving any warning. The father remained motionless and the car turned around him, but the mother jumped back and was attempting to pull the child with her when he was struck. The car was facing in a northeasterly direction when it stopped.

Although the driver of the automobile had planned to make a left turn at the intersection, he and his guests are positive that the turn had not been commenced when the collision happened and that a straight course toward the south was being maintained at that time. In substantiation of this position, they tell of their efforts, subsequent to the injury, in causing plaintiff and his family to enter the car and of driving them to their destination west of the intersection. In leaving the scene, according to their testimony, the car made a normal right turn into West Jordan without its being maneuvered in a backward or other course. Their testimony as to the manner of making this right turn is uncontradicted.

In reaching our conclusion herein with reference to the alleged negligence of defendant's son in his operation of the car, it was unnecessary for us to determine whether or not the vehicle was actually turning to the left at the time of the unfortunate occurrence. Even if it be conceded that such left turn was not being made, the evidence is convincing that the driver was guilty of actionable negligence in failing to keep a proper lookout when entering the intersection.

According to the testimony in the record, he was not observing generally the traffic conditions of the intersection. At one point in his testimony, given under direct examination, he stated: "I was looking ahead. Straight ahead of me to the light." He frequently testified that he was looking ahead. It is the contention of defendant's counsel, however, that the driver, in looking ahead, as he said he did, maintained the lookout required by law. In this connection, we are referred to a statement in the opinion of Buckley v. Featherstone Garage, Inc., 11 La.App. 564, 123 So. 446, 450, decided by us, that, "The duty of the driver to look ahead never ceases." This language was not used in the sense of restricting the driver's eyes to a particular object in front of him or confining them to an imaginary lane, the width of the car, through which such vehicle would travel. The intent of that statement was that the driver should continuously maintain such a general observance of the street or road on which he proposes to travel as might be required by the traffic conditions thereof.

Our attention is directed to the fact that the pedestrians were not within the designated safety lane when injured, and to an ordinance of the city of Shreveport which provides that, "When the traffic control is in operation pedestrians shall cross the street at no point other than crosswalks at street intersections." The argument is then presented that if plaintiff and his family were at a point where they had no right to be, and where the driver of the car had no reason to expect them, defendant's son should not be held to that high degree of care and vigilance as if no signal system was in operation, and that he had the right to assume that the signals and the provisions of the ordinance would be observed by the pedestrians.

In the Buckley Case, supra, which is relied on and quoted from by defendant's counsel, the facts were that plaintiff was struck by a taxicab, as it was traversing an intersection on the green light, when she left the curb on the wrong signal and walked into the path of such vehicle. Recovery was denied to her, because she stepped from the curb into the street almost immediately in front of the moving car, and had taken only about three steps when struck. It was almost a momentary happening. The driver could not have seen plaintiff in her perilous position and avoided the injury by the exercise of reasonable care and prudence. In the opinion, which was written by Justice Odom, who is now a member of the Supreme Court, it was said:

"In our opinion, the duty of the driver to look ahead never ceases. Even though rightfully on the highway and the right of way be his, he must still look. In a city where traffic is controlled by the signal light system, neither pedestrians nor vehicles are permitted to enter an intersection on the wrong signal, and to do so is negligence. But the driver of a vehicle who is rightfully in the intersection owes a duty to those who may be negligently therein, and that duty is not only to avoid injuring them when and if their peril is discovered, if he can reasonably do so, but, further, to use due diligence to discover their presence. It has been held that a railroad company owes no duty to trespassers, except to use due care to avoid injuring them after their presence on the right of way has been discovered. But those who inhabit public streets and highways are not trespassers. They have a right to be there, and, even though they negligently exercise that right, yet the driver of an automobile owes to them the

duty of using due care to discover their presence.

"Under the traffic light system, a motorist who is proceeding under the proper signal should not be held to that same high degree of care and vigilance as if no such system prevailed. He has the right to assume that the signals are understood and will be observed, and he is not required to anticipate that pedestrians will violate the ordinances and rules and enter a crossing on the wrong signal. The danger at such crossings is less than if there were no such signals, and therefore, less care is exacted. A motorist must use such diligence and care as is commensurate with the dangerous character of the locality. But, even though the danger be slight, he is not absolved from the duty to look ahead. * * *

"Under the last clear chance doctrine an injured person may recover in a personal injury suit, even though he has been guilty of negligence in exposing himself to danger, if the defendant knew of such danger and could have avoided the injury by the exercise of ordinary care and fails to do so. * * *

"Plaintiff was negligent in going into the crossing as she did. She exposed herself to danger and placed herself in a position of peril. Even so, if defendant's driver knew of such danger, or if by the exercise of reasonable care and prudence he could have seen plaintiff in her position of peril and could have avoided the injury and failed to do so, defendant would be liable.

"But there is no room here for the application of the last clear chance rule. The driver of the taxicab had no last clear chance to avoid striking plaintiff."

■ The opinion in the Buckley Case gives approval to the holding in the case of Ivy v. Marx, 205 Ala. 60, 87 So. 813, 14 A.L.R. 1173, wherein it was held that the driver of an automobile is not relieved from the duty of maintaining a lookout for a pedestrian who is crossing a street diagonally at a place other than a street intersection, and which crossing is forbidden by ordinance under penalty.

There is no doubt that the pedestrians, in the case at bar, violated the provisions of the city ordinance and crossed the street at the wrong place. But even taking that into consideration, when the car reached the safety lane they were not more than 28 feet from and south of the south line of such lane, and were almost in the center of Texas avenue. Also, they were immediately opposite the north sidewalk of West Jordan street, and were between the traffic signal and the driver's car. As before stated, the street lights and car lights were burning. The pedestrians were not concealed by any obstructions. There is no suggestion or assertion that the child suddenly dashed from an obscure position into the path of the traveling machine. No explanation is given as to why the pedestrians were not seen, and it is not contended that the slight sprinkling of rain interfered with the driver's vision. It appears that defendant's son had his eyes fixed on the light ahead of him, as he stated, and was not observing traffic conditions.

In the case of Burvant v. Wolfe, 126 La. 787, 52 So. 1025, 1027, 29 L.R.A. (N.S.) 677, plaintiff's eleven year old son was struck down by defendant's automobile, driven at a speed of about six or seven miles an hour, as he was running, diagonally in the street and in the middle of a block, toward a crowd. The boy was not seen by the driver, who had his eyes focused on the crowd. The court there said:

"There can be no question of contributory negligence in the case. Cases of persons going upon railroad tracks have no analogy. The boy's attention was fixed upon the excitement ahead of him; as everybody else's was. He was simply following others who had just preceded him, going in the same direction. If he had thought of the matter at all, he would have had the right to assume that an automobile or other fast-moving private vehicle would not run him down.

"But if there was contributory negligence, still the defendant would be responsible, under the last-chance doctrine, for had he been looking (as he was legally bound to be doing) he would have seen the boy, and seen that he was unaware of the danger into which he was going. Possibly it would, even then, have been too late; but defendant should have been sufficiently attentive to have been in a position to make the trial."

■ It can only be concluded that the driver, in this case, did not exercise reasonable care and prudence and due diligence to discover the presence of plaintiff and his family, even though they were in a place where they had no right to be.

We believe that he would have seen them if he had been duly observant, and that he could have avoided the accident. This belief is strengthened by the fact that the driver was planning to turn east at the intersection, while the pedestrians were a short distance southeast of the car when he entered the safety lane. Thus the last clear chance was with the driver of the vehicle.

■■ The law charges an automobile driver with seeing what he should have seen. In the case of Loewenberg v. Fidelity Union Casualty Co., 147 So. 81, 87, we said that the rule in Louisiana is that, if defendant did not see the danger, but by the exercise of ordinary care could have seen the danger in time to avoid the injury, the doctrine of the last clear chance will apply.

The Supreme Court, in the case of Mercer et al. v. Rosenblath, 156 La. 249, 252, 100 So. 414, 416, approved the holding in the Burvant Case, supra, and said: "What they could have seen the law declares they did see. So that, if there was the slightest room for the plea of contributory negligence, the defendant would nevertheless be responsible under the last clear chance doctrine."

Defendant's counsel cites and quotes from the case of Manuel v. Bradford (La. App. Orleans Circuit) 166 So. 657, which referred to the Buckley Case, supra. We have read the opinion of that case, and by reason of the factual situation involved therein, we think that it does not conflict with the views which we herein express.

As we have found that defendant's son was negligent in failing to maintain the required lookout in entering the intersection in question, it is needless for us to discuss the other charges of negligence set forth in the petition.

It is likewise unnecessary to pass upon the matter of the alleged contributory negligence of plaintiff and his minor son, in view of what we have hereinabove said and held with reference to the last clear chance doctrine.

■ The evidence shows that the child received a fracture of the femur or thigh bone about 2½ inches above the knee. A cast was applied, and use of the leg was not permitted for about four weeks. The break had a good position, and a complete union resulted. There was no shortening of or other permanent damage to the leg.

The boy probably endured pain for about two weeks after the injury. For this damage, plaintiff was granted judgment for the use and benefit of his son in the amount of $300. We think that the amount was neither inadequate nor excessive. The judgment of $30 awarded plaintiff in his individual capacity was for physician's fees. This item is sustained by proof.

The judgment is correct, and it is affirmed.