## EGGLESTON v. LOUISIANA & A. RY. CO. et al., and five other cases.

### No. 5997.

Court of Appeal of Louisiana. Second Circuit.

Nov. 3, 1939.

Rehearing Denied Dec. 1, 1939.

Jack & Jack, of Shreveport, and Wallace & Stinson, of Benton, for appellants.

A. L. Burford, of Texarkana, Tex., and White, Holloman & White, of Alexandria, for appellees.

HAMITER, Judge.

All occupants of a 1937 Pontiac sedan, being four in number, were killed in a collision involving that automobile and a mixed freight train at a railroad crossing on U. S. Highway 71, during the early morning of November 22, 1937.

The above styled six tort actions grew out of the unfortunate and sad occurrence. They were instituted by heirs and legal representatives of the decedents. The defendants impleaded in each are the train's owner, the Louisiana & Arkansas Railway Company, and the locomotive engineer, G. W. Smith.

The petitions of plaintiffs, the allegations of which are substantially identical, attribute the accident to various alleged acts of negligence on the part of defendants, including the engineer's failure to avoid it when he had the last clear chance to do so.

Defendants deny that either was negligent. In the alternative, they aver contrib-

utory negligence on the part of the occupants of the automobile.

The cases were consolidated in the district court and tried together.

The trial judge found and held, as his written reasons for judgment disclose, that neither of defendants was negligent; and he rejected the demands of all plaintiffs. Appeals by the last named litigants followed.

The causes were docketed in this court under one number and argued and submitted in consolidated form.

U. S. Highway 71 at and near the scene of the accident is an 18-foot concrete slab, pursues a straight course and runs in a northwesterly and southeasterly direction. It is an important part of the Louisiana and federal highway systems, serving vehicular traffic from Shreveport to Alexandria, Baton Rouge, New Orleans, and other points south and southeast. In this discussion we shall consider its direction of travel as being north and south.

Converging at a point approximately 725 feet north of the crossing in question are the mentioned thoroughfare and U. S. Highway 80. The latter accommodates east and west traffic. This intersection is situated within the corporate limits of Bossier City, Louisiana, and those fused highway arteries proceed westerly through that municipality to and into the city of Shreveport. The southern boundary line of Bossier City is approximately 405 feet south of such intersection and 320 feet north of the place of accident.

U. S. Highway 71 is level from said intersection south to a point 400 feet north of the crossing. During the next 300 feet it experiences an incline of 14 inches. From a point 100 feet north of the center of the crossing to a point 50 feet south thereof a level surface prevails. Thereafter, continuing south, a decline is noted.

For a number of miles south of the crossing the main line track of defendant, Louisiana & Arkansas Railway Company, lies east of, parallel with, and approximately 80 feet from U. S. Highway 71. Looking from the south toward the north, the main track, after following the mentioned parallel course, curves northwesterly, passes over the highway at an angle of approximately 30 degrees, and forms the crossing at which the collision occurred. From the beginning of that curve, which point we shall hereinafter refer to as "the turn", to the eastern

edge of the concrete, measured along the track, is a distance of 495 feet. Continuing, it is approximately 56 feet farther to the western edge of the pavement. The main track is almost level from a point 100 feet east of the highway to a point 100 feet west thereof.

A track extends from the turn north and in a parallel position to the highway, but this is used by several railroad companies only for switching purposes. South of the turn, between the pavement and main line track, are other tracks that are also used for the switching of freight cars.

The mixed train in question departed from Filston, Louisiana, about twelve hours before the collision, on its 178 mile northerly journey to Shreveport. The locomotive thereof was operated by defendant Smith, whose career as an engineer dates back to the year 1905, and had not been previously marred by a crossing accident. Numerous stops were made during the trip and the average running speed was 25 miles per hour. On nearing its destination, the train consisted of the locomotive, a water car, 28 average freight cars, and a caboose. Of the freight cars, 7 were loaded, while the remaining 21 were empty. It possessed air brakes known as Standard E. T. equipment. The headlight of the locomotive stood 12 feet, 5½ inches from the ground and, according to a test made shortly after the collision, was in perfect condition and met all requirements of the Interstate Commerce Commission.

While traveling north, and when about 900 or 1200 feet from the aforementioned crossing and south of the turn, the engineer slowed the train from 12 to 10 miles an hour. At this speed it proceeded past the turn, into and along the curve, and across the highway. The Pontiac sedan was struck while traveling south with its right wheels about one foot east of the pavement's western edge. The course of this automobile had been easterly through Bossier City to the above referred to intersection, located approximately 725 feet north of the crossing, and then in a southerly direction on highway 71 to the point of collision. It traveled at a speed of approximately 60 miles an hour. No tire marks were found on the pavement tending to disclose an application of its brakes and a voluntary reduction of that speed. The left front portion of the automobile came in contact with the locomotive's front end at some point between the right extremity of

the pilot beam and the draw-head or coupler. The train proceeded 100 to 110 feet farther before stopping, while the motor vehicle was knocked around and came to rest just off the western edge of the pavement, near the track, with its front pointing northwesterly.

The time of the occurrence was 12:45 A. M. o'clock. No rain or fog then endured, and consequently good visibility existed. Cold weather prevailed, and all windows of the automobile were closed. The pavement was dry.

█ It is contended by plaintiffs that the train possessed defective braking facilities and the operation of it in that condition was negligence. This contention is predicated on the testimony of two witnesses offered by them to the effect that an emergency stop of a train traveling ten miles per hour can be made in 60 or 70 feet if the brakes are working properly. Defendant's train required a distance of from 100 to 110 feet. According to other proof in the record, however, the entire braking equipment was checked within four hours after the accident and it was then found to be functioning satisfactorily. Furthermore, an air brake instructor, employed for 33 years by the manufacturer of the brakes used, testifies that the stop made in 110 feet was a good one, considering the train's weight, size and composition. The evidence, viewed as a whole, does not disclose the existence of defective braking facilities.

A further charge of negligence is that the crossing involved was of an extraordinarily dangerous nature due to its location and the surrounding physical features; that the engineer and railway company knew of this condition and that persons unfamiliar with the crossing would traverse it; and that said defendants owed an affirmative duty to take and provide proper safety precautions in proportion to the degree of danger. In connection with this charge, plaintiffs' counsel emphasize the fact that "at the crossing there were no gates, no electric bells, no flashing lights, no flood light, no flagman or watchman", and then direct particular attention to the attending features detailed hereafter in this paragraph. U. S. Highway 71, being a part of the federal and state systems, accommodates a great volume of vehicular traffic. One and one-half miles south of the crossing is Barksdale Field, having a population of 2,000. A short distance north and west are the municipalities of Bossier City and Shreveport, the population of the latter

being 100,000 and that of the former in excess of 3,500. Numerous residences and business establishments are located along the highway between the collision point and Barksdale Field. Systematic checks of traffic made under the direction of plaintiffs' industrious counsel, disclose that approximately 5,500 vehicles traverse the crossing each 24 hours. Near midnight, however, the travel is comparatively light, it consisting of about 50 cars per hour. The main line track curves northwesterly and angles across the pavement after paralleling the highway for a number of miles. A short distance from the crossing, on each side thereof, the highway experiences a decline.

The following factors and circumstances are also pertinent, but they do not lend assistance to plaintiffs' position: Two elevated warning signs stood on the western shoulder of the highway, 8.7 feet from the concrete's edge. One was a large, almost square sign that contained the words, "Louisiana Law Stop", and was located 58 feet north of the north rail of the track. The other was smaller in size and round, contained the glass studded letters "RR", and was situated 93 feet farther north. The lettering on both markers was plainly visible to and could be easily read by approaching motorists. No building, sign board, tree or other object existed or served to obscure the train from the vision of those in the Pontiac sedan after that machine began its southerly course on U. S. Highway 71. The locomotive's headlight was burning brightly as it proceeded into and along the curve. While a straight course was followed the rays of the light shone on the railroad right of way and to some extent illuminated the highway. They began playing directly on the pavement shortly after the curve was entered, and worked gradually toward the crossing as the locomotive's turning progressed. Before Barksdale Field was reached the automatic bell was set in motion and it rang continuously thereafter. The blowing of the whistle commenced a short distance south of the turn. The blasts given were two longs, a short and a long. The engineer states, "I spaced them so far apart that it brought me way around close to the crossing when the last whistle was sounded." This "close to the crossing" point is estimated to be from 50 to 100 feet away.

█ The law with reference to the necessity of maintaining flagmen or suitable signals at railroad crossings is well stated in Section 1714 of Blashfield's Cyclopedia

of Automobile Law & Practice, Vol. 3, Permanent Edition. Therein it is said:

"It is not every crossing of a highway, under the common law, independent of statute or ordinance, at which a railroad is required to have a gate or flagman, or maintain signals and lights, but only those crossings at which precautions of that character are reasonably necessary to the protection of travelers. The duty arises only when demanded by ordinary prudence to protect travelers exercising ordinary care against dangers resulting from the prudent and usual operation of trains.

"That which is a reasonable necessity for such protection at one crossing may be wholly needless and unnecessary at another. The determination of the question in each case depends upon the amount of travel over the highway, the frequency with which trains pass across it, the visibility of trains to travelers approaching the crossing, and other conditions relevant to the danger at the particular locality.

"Unless, therefore, such precaution is required by some statutory enactment, a railroad is not negligent in failing to provide gates, a flagman, or other warning devices at an ordinary crossing; failure to provide such protection at a crossing being negligent, under the general rule, only where the location and surrounding conditions and the manner of running trains are such as to render it dangerous."

Citing Smith v. Louisiana & Arkansas Ry. Co., 10 La.App. 502, 120 So. 669; Washington v. Yazoo & M. V. R. Co., 11 La.App. 635, 124 So. 631; Natal v. Louisiana & Ark. Ry. Co., 18 La.App. 50, 137 So. 600.

■■ There is no statute or ordinance compelling the flagging of the crossing in question or the maintenance of safety devices there; and, in our opinion, the surrounding conditions and circumstances do not render it extraordinarily dangerous, requiring the taking of those precautions. It is true that thousands of vehicles traverse it daily, this being due to the importance of the highway and the populous centers located in relatively close proximity thereto; but this factor alone is insufficient. "The circumstance, without more, that the crossing is a much-used one, greatly frequented by travelers, is insufficient as a basis upon which to predicate negligence from a failure to maintain such watchmen or warnings." 3 Blashfield's Cyclopedia of Automobile Law & Practice, Permanent Edition, § 1714, cited supra. On the other hand, the crossing is not of the hidden type. There is no obstruction within a distance of 725 feet north of it to prevent a motorist from having a complete view of approaching trains. And on the morning of the accident weather conditions were not unfavorable. By reason of this unobstructed view and the prevalence of good visibility, the presence of the curve and the possible fact that the motorists were unaware of the crossing's existence, appear to be of small importance with reference to the issue of negligence under consideration. Furthermore, appropriate signs, required by the laws of this state marked the crossing, and ample warning of the train's approach was furnished by the beaming light, the sounding of the bell and whistle, and the bright glare from the firebox of the locomotive.

Our last expressed opinion does not seem to be in conflict with the doctrine announced in Eichorn v. New Orleans & C. R. Light & Power Co., 112 La. 236, 36 So. 335, 104 Am.St.Rep. 437, relied on by plaintiffs. The two cases differ as to facts. Therein the decedent was crushed between two streetcars operated by defendant on one of the busiest thoroughfares of the city of New Orleans; and the tracks on which these vehicles ran were maintained too close together, thus creating an obviously hazardous situation.

The case of Miller v. Baldwin, et al., La.App., 178 So. 717, does not involve a crossing accident and is inapplicable here.

Plaintiffs' counsel cite and quote from Pittman v. Gifford-Hill & Company, Inc., La.App., 188 So. 470. That decision likewise has no application. It was argued and presented in this court under exceptions of no cause of action, and we were called upon to determine only the question of whether or not the petition on its face disclosed that the plaintiff was guilty of contributory negligence.

■■ The crossing in question lies within the yard limits of the defendant railroad company, and the following regulation, established by that company, prevails in the area: "Restricted speed: proceed prepared to stop short of train, obstruction, or anything that may require the speed of a train to be reduced." Counsel direct attention to that provision and argue that it gives recognition to the dangerous nature of the crossing, requiring increased safety precautions and decreased speeds;

and also recognizes that a speed of 10 miles an hour there, such as was employed by the train in question and necessitated a distance of from 100 to 110 feet for stopping, is excessive. It does not appear that the existence of this particular crossing influenced the adoption and enforcement of the quoted regulation. Obviously, such was made necessary by the numerous tracks in that locality and the large amount of switching of freight cars performed there. In all events, however, it fixes no maximum speed; and a rate of 10 miles an hour does not seem to be excessive there, for an object on the tracks would be disclosed by the light of the locomotive in sufficient time, if that speed is employed, to permit a stop and the avoidance of a collision.

Reference is made to the case of Martin v. Yazoo & M. P. R. Co., 181 So. 571, wherein we held that a train must be operated at a speed that will not endanger the lives of those using the city streets, notwithstanding no speed limit is fixed by any law or ordinance, and further said that a rate of six miles an hour should be the maximum at the crossing involved. The mentioned rate was decided upon because of the obstructions and other physical conditions that surrounded the crossing and rendered it extraordinarily hazardous. The place of the collision in the present case is, as above shown, not cloaked with similar obstructions.

Next for consideration is the contention that the engineer had the last clear chance to avoid the accident and neglected to take advantage of his opportunity as duty demanded. According to the record, he observed the Pontiac just after its entrance onto U. S. Highway 71, approximately 725 feet from the crossing. No other machines were in view. The locomotive was then negotiating the curve, its front being 75 feet from the east edge of the pavement and 110 feet from the point of collision. The speed in miles per hour enjoyed by the vehicles was, as before stated, 60 for the automobile and 10 for the train. Reduced to feet per second, the former was moving 88, while the latter 14½. Employing a time computation, it is to be noticed that each was approximately eight seconds from the place of impact when the engineer first saw the automobile. His eyes remained focused on the approaching, fast traveling, and unchecked machine as the locomotive proceeded. It is his testimony, elicited as a witness for plaintiffs, that:

"I didn't have any idea about the man not stopping. It never occurred to me—it has happened so many, many times in passing over crossings that the cars drive right up and stop that I had no reason to believe he would not stop. None whatever. It was the only automobile in sight and there was nothing in the world to distract his attention or to obstruct his view, and I didn't have any idea but what he would do as thousands of others do, drive up there and stop.

\* \* \*

"Just a few seconds before this impact the fellow was getting too close, I felt like he was getting too close, and I reached up and caught the whistle cord and slammed the brakes on in emergency with my left hand.

\* \* \*

"At the first realization I applied the emergency brake. The first realization I had that he might not stop, that he might be drunk or something else. I was not certain he was not going to stop and I was not certain he was but as a precaution against accident I made this emergency stop. I knew I could start again if I stopped and so I didn't worry about it at all but before I got thoroughly stopped he had already hit me."

When the mentioned act of braking was resorted to the locomotive was on the concrete highway.

The argument advanced in support of the contended applicability of the last clear chance or discovered peril doctrine is, as shown by counsel's brief, that: "If the engineer had braked the train a moment or so earlier, the automobile would have cleared the locomotive and there would have been no collision. And this even though such earlier application of brakes would not have stopped the locomotive short of the point of impact." In connection with this, the theory of deceleration or retardation is urged and discussed, and figures and computations are given.

Recent jurisprudence of this state relating to the doctrine of the last clear chance or discovered peril is found in Rottman v. Beverly, 183 La. 947, 165 So. 153; Monk v. Crowell & S. Co., La.App., 168 So. 360; Hicks v. Texas & N. O. Ry. Co., 186 La. 1008, 173 So. 745; Iglesias v. Campbell, La.App., 170 So. 265; Id., La. App., 175 So. 145; Russo v. Texas & Pacific Ry. Co., 189 La. 1042, 181 So. 485; Jackson v. Cook, 189 La. 860, 181 So. 195; and Clark

v. DeBeer, La.App., 188 So. 517. The rule furnished by those authorities is that where a person negligently places himself in a perilous situation and his negligence and peril are actually discovered by the operator of the offending vehicle, or by the use of reasonable care should and could have been discovered, there is then a duty on the part of the operator to save that person from the consequences of the negligent act, if, by the exercise of due diligence, such can be done. If said operator, after the actual or constructive discovery of the existing peril, could have prevented the occurrence of an accident by the exercise of due diligence and failed to do so, such failure constitutes negligence and is considered the proximate and immediate cause of the accident and resulting injury, and the person's negligence the remote cause; and said person may recover, although his negligence continued to the moment of the accident.

Let us now consider the instant case in the light of the stated rule. The evidence shows that the engineer did not actually discover the peril of the motorists until about two seconds prior to the occurrence of the accident. The automobile at that time was 176 feet from the point of collision, while the front end of the locomotive was only 29 feet therefrom. Everything possible was then done by him to avoid the mishap but without success. The evidence is also convincing that if efforts had been made to stop the train when only three seconds intervened or the locomotive's front was 43½ feet away, the avoidance would likewise have been impossible. This finding is influenced by the fact that at least one second is required for the emergency brakes to take effect after being applied. Can it be said, however, that the engineer could and should have discovered the perilous situation earlier and when a sufficient distance away to prevent the accident through appropriate application of the brakes? We think not. The statutory law and jurisprudence of this state require that ordinarily a motorist give heed to a train approaching on a railroad crossing. In view of this requirement and as the train involved was plainly visible to the occupants of the Pontiac sedan and they were properly warned of its oncoming, the engineer was entitled to assume, when at least four seconds from the point of contact, that said automobile would come to a stop and not rush into the path of travel. Such a stop was possible.

The machine traveled 60 miles per hour or 88 feet per second, and four seconds prior to the accident it was 352 feet from the crossing. A motor vehicle proceeding at such speed, whose brakes are in good condition, may be brought to a stop in a distance less than that. Volume 9, Section 6237, Blashfield's Cyclopedia of Automobile Law & Practice, Permanent Edition.

Our careful and thorough consideration of these cases, particularly our close study of the voluminous record that presents them, leaves us with the same conviction entertained by the trial judge, which is that no acts of negligence are shown to have been committed by the defendants proximately causing the deplorable and untimely tragedy. In view of this finding and holding, a discussion of the alternative pleas of contributory negligence is unnecessary.

The judgments appealed from are affirmed.