As Mrs. Connie Law, a pedestrian and plaintiff herein, was traversing West Front Street at its intersection with Pine Street in the small incorporated town of Olla, LaSalle Parish, Louisiana, she was struck and seriously injured by a Ford V-8 automobile driven by A.J. Osterland. This occurred about 8 o'clock, shortly after darkness had commenced, of the evening of August 5, 1939.
In this tort action, Mrs. Law asks a solidary award of damages against A.J. Osterland, A.J. Osterland Company, Inc., and the Gulf Insurance Company, the latter being the public liability and property damage insurer of the automobile. It is charged in the petition that the accident was caused solely by the negligence of the machine's operator in that he approached the intersection at a speed greatly in excess of the limits fixed by law and failed to keep a proper lookout for the safety of persons using the street. Additionally, plaintiff asserts that the collision could have been averted had a proper lookout been kept.
Defendants, in their joint answer, deny the several acts of negligence attributed to the car's driver. They affirmatively aver that the mishap was proximately caused by the sudden negligent and heedless act of plaintiff in running from behind parked cars "directly into the path of the approaching automobile of defendant A.J. Osterland"; and that the latter, upon seeing the pedestrian, "instantly applied his brakes with full force and otherwise utilized every means at his command to avoid striking the plaintiff." In the alternative, they plead as a bar to recovery that she was guilty of contributory negligence.
Written reasons were assigned by the district court in support of its judgment which condemned the defendants in solido to pay to plaintiff $8,000 for the suffering, pain and injury that she sustained, and additionally *Page 676 
$2,000 for medical, nurses and hospital expenses incurred.
The case is before us on an appeal perfected by defendants. Through an answer filed here, plaintiff urges an increase in the amount awarded to her.
West Front Street runs north and south through, and is the main thoroughfare in, the business district of the town of Olla. At and in the vicinity of the Pine Street intersection, it is 62 feet in width and is of gravel and asphalt construction. Looking easterly from the curb line on the street's western side, where practically all of the commercial establishments are located, there are approximately 15 feet of gravel and then 47 feet of asphalt. A traffic stripe exists on the asphalt surface parallel with and 11 feet from its eastern edge, or 51 feet from said west curb line. Approximately 8 feet farther east of such eastern edge, and running parallel therewith, is a shallow ditch; and beyond this are the tracks of the Missouri Pacific Railroad Company.
Pine Street, of which about 50 feet accommodates vehicular traffic, crosses West Front Street at right angles in an easterly and westerly direction. On its south side, west of such main thoroughfare, is a sidewalk. Spanning the above-described shallow ditch, and located east of West Front Street, is a wooden bridge for pedestrian use 4 feet wide and 12 feet long; and it is in line with the mentioned sidewalk.
The Olla State Bank building occupies the southwest corner of the intersection, in front of which is a street light; while the Olla Mercantile Company is immediately across Pine Street on the northwest corner.
The portion of West Front Street adjacent to the traffic stripe is a continuation, or rather a part, of U.S. Highway 165, which accommodates considerable vehicular traffic operating between Monroe, Louisiana, and Alexandria, Louisiana. Northbound traffic employs the 11 foot asphalt surface east of the stripe and vehicles going south are driven on the west side of it.
The maximum speed of automobiles permitted by law in the town of Olla is 25 miles per hour; and this limit is well publicized through the medium of appropriate road signs.
Mrs. Law departed from her residence located in the western portion of the town on the evening of August 5, 1939, with the view and purpose of attending a church service in the eastern section. In her attempt to traverse West Front Street, she travelled from the northwest corner of the intersection in question, at the Olla Mercantile Company building, toward the southwest or Olla State Bank corner; and when about half way between those two points she turned left and proceeded diagonally and southeasterly toward the foot bridge east of the main street. When in the vicinity of the traffic stripe, which as above shown is 51 feet from the street's west curb line, she was struck down by Osterland's automobile.
Osterland, a resident, of Oakdale, LaSalle Parish, Louisiana, is the president and general manager of A.J. Osterland Company, Inc., which deals in piling and poles used principally by railroads and the war department of the United States Government. Numerous lumber yards are maintained by it throughout Louisiana, and this factor compels said general manager to do much travelling. On the evening of the accident he was travelling from Monroe, Louisiana, where he had transacted business, south toward his home at Oakdale, Louisiana. Similar journeys had previously been made on numerous occasions, and he was thoroughly familiar with traffic conditions and regulations in the town of Olla, including the speed limit of 25 miles per hour.
Olla was entered by him on its north side, and he sought to travel south through it. When approaching the scene of the accident, his car, he testified, was "six or seven or eight inches" to the right of the traffic stripe. The weather was dry and hot; in fact the asphalt was somewhat soft because of the existing intense heat. As darkness had already set in, the automobile's head lights were burning. Also aglow were numerous lights of the business houses and the street light in front of the Olla State Bank.
Mr. Osterland's version of the accident's happening is that as he neared the intersection, travelling "25, 29 or 30 miles an hour," he observed another automobile approaching from the opposite direction and east of the traffic stripe. Other machines were then parked at the curb on the street's western side, but neither these nor anything else obstructed his view of the roadway. Suddenly, Mrs. Law, whom he had not previously seen, appeared in front of his car. She was "running in a 45 degree angle about," headed east; and "she stepped three or four steps" before being struck. Immediately on her being seen, his automobile was steered toward the left and its brakes *Page 677 
applied with the view of avoiding contact; these efforts were unavailing, however, and the right front portion of the radiator struck the pedestrian on her left side. The car was brought to a stop several feet south of the intersection and south of the foot bridge, and the injured woman was picked up at a point 4 or 5 feet in front of it.
Regarding the unfortunate event, Mrs. Law testified in part: "As I was going across the street I looked both ways I am sure because I always do. I didn't see any car or if I saw any car lights I was sure I could get across ahead of them. I was across the black line when I noticed this car's lights bearing down on me." She further stated that she was "nearly across the street," and "as far down as the foot bridge."
The trial judge, as his written opinion discloses, concluded that Osterland was guilty of negligence in driving the automobile at an excessive rate of speed, he having found as a fact that the speed being travelled was between 45 and 50 miles per hour. The evidence, we think, amply supports that finding, and we concur in the legal conclusion expressed.
Standing in the street in front of his combination home and office, when the Osterland car passed there, was Dr. J.A. Gaharen, the coroner of LaSalle Parish for eight years. His place is located one block north of, and on the same side of the street as, the Olla State Bank. Dr. Gaharen saw the car "passing at a very rapid rate," estimated by him at "not less than 50 miles nor more than 60 miles per hour," and he watched it until he "heard it impact into something." He then walked to the scene of the accident.
Individual measurements of the skid marks, created on the asphalt by the car's braking mechanism, were taken by Dr. Gaharen and by numerous other persons. These measurements varied from 60 feet up to 78 feet; but the witnesses were unanimous in their views that the marks were unbroken and showed continuous sliding of the tires for the respective distances found by them.
A state highway officer, who has served in that capacity for a number of years, opined that the car was travelling at approximately 50 miles per hour. His opinion was based on the length of the found skid marks, which he stepped as 78 feet, considered in the light of special studies and tests previously made by him and the State Police Department of automobiles brought to stops by sliding of the tires. Testified he: "A car running at the rate of 30 miles an hour (is) supposed to skid 35 feet; running at the rate of 35 miles an hour it will skid 45 feet and running at from 40 to 50 miles an hour it is supposed to go 65 feet. That is as far as we have taken a test."
Attached to the brief of defense counsel, but not a part of the evidence, is a chart or diagram made public under the authority of the National Safety Council. This purports to show "in car lengths and in feet, the distances that an average driver takes to stop when road conditions are at their best and tires and brakes are in excellent condition." It recites that at 40 miles an hour, the stopping distance is 128 feet; of this, about three-eighths, or 48 feet is used for reaction purposes, while the remainder, or 80 feet, is the actual braking distance. Pointing to these figures, defense counsel submit: "According to the brake marks, and if we strike an average between the highest and lowest estimates of the witness, say 70.50 feet, Mr. Osterland was not exceeding 35 miles an hour * * *."
Even if consideration could be given to the described chart, the figures provided therein would have no relevancy to the factual situation with which we are now dealing. Here the stop was one prompted by and resulting from the existence of an emergency; and it was attended with the skidding of all four tires for an appreciable distance. The diagram provides distances, as it states, "that an average driver takes to stop"; and, as we appreciate it, does not contemplate an emergency stop through a lengthy sliding process.
Attention is also directed by counsel to the fact that the asphalt was somewhat soft by reason of the hot weather that existed, and they contend that this condition was responsible to a great extent for the distance skidded by the machine. This contention is not supported by the record.
Mr. Osterland was also negligent, we think, in not keeping a proper lookout. If he had been maintaining the vigilance required by law, obviously he would have observed plaintiff as she walked across West Front Street. The thoroughfare was reasonably well illuminated by the aforementioned lights, and there was nothing on *Page 678 
the street, in an area of 600 feet north of the intersection and 36 feet west of the traffic stripe, to obstruct his vision.
In explanation of the failure of the driver to so observe plaintiff, his counsel strongly suggests that plaintiff "came out on to the highway running diagonally" and continued that rapid progress in her efforts to reach the opposite side. This is not convincingly shown by the evidence. No one saw plaintiff until she reached a point immediately in front of the automobile. She was then seen running toward the east, a movement undoubtedly provoked by the perilous position in which she found herself. According to plaintiff, her running did not commence until she noticed the automobile lights bearing down on her; and Osterland himself testified: "Yes, she was in front of my car and the woman had not been running. I pulled in and she moved into me. I done all I could to beat her, but of course the lady didn't see me."
Anent the issue of plaintiff's alleged running the following expressions of the trial judge are in accordance with out views: "We think it unreasonable and unnatural, from the evidence, taking into consideration the age of the plaintiff, to conclude that she started on the western edge of Front Street at the Bank corner and was running across the street a distance of sixty-two feet. She was thirty-eight years of age, dressed and on her way to attend church, and she is a woman of reasonable sense. Therefore, we cannot conclude from the facts that the plaintiff started and was running across the street from the western edge to the eastern side. The only logical thing, if she did run, was because at the time when she saw the automobile was upon her and heard the brakes applied, then she made an effort to escape."
On the other hand, we think that plaintiff did not employ the requisite care and caution in her endeavor to traverse the principal street of the town of Olla, and that she was grossly negligent to the moment of the accident. There were no obstructions to deny to her vision of the oncoming, fast moving motor vehicle; and she would and could have noticed its approach in time to avoid entering the path of travel if the legally required observations had been made.
This brings us to another issue, regarding which defense counsel, in their brief, offer the following comment: "It is our deliberate judgment that there is only one question involved in this litigation, with which your honors will be at all concerned, and that is: Whether the doctrine of last clear chance applies here?"
In our opinion, an affirmative answer must be given that query, in view of the holding of this court in Iglesias v. Campbell, La.App., 170 So. 265, and Id., La.App., 175 So. 145, and of the Supreme Court in Jackson v. Cook, 189 La. 860, 181 So. 195. Those cases involve factual situations somewhat similar to the one of the instant controversy, and they appear to be controlling of this decision. In each of them a pedestrian, who was incautiously and imprudently using the street, was struck and injured by a negligently driven motor vehicle. The driver of the car did not actually see the injured person until too late to avoid the accident, although observance in sufficient time for an avoidance would have been his had he been keeping a proper lookout. In the Iglesias case (on rehearing 175 So. 145, 148) we stated: "It is an inexorable rule of law that the operator of an automobile is held to see that which he should have seen and which, of course, may be seen and observed by human eyesight; and this being true, we can see no sound reason for holding that the operator must actually see the injured person in time to avoid colliding with him in order that the doctrine of the last clear chance may be correctly applied."
The following was said in the Jackson case [189 La. 860, 181 So. 198]: "In the present case the plaintiff was guilty of gross negligence which continued up to the moment of the accident. The driver of the car did not see, but could have seen, plaintiff in his peril if he had been looking ahead. The mere fact that the driver of the car in this case did not see plaintiff does not absolve the defendant from liability, because it was the duty of the driver to look, and, according to the findings of both courts, he was not looking."
In the instant cause, it is stated in the brief of defense counsel "that the burden was on the plaintiff in this case to produce a preponderance of evidence to the effect that the defendant driver, Osterland, under the circumstances existing at the time, not only could have seen the perilous position of the plaintiff, but could have seen her in time to have averted injuring her." We find it unnecessary to decide the question *Page 679 
of who carries the burden of proof, for the evidence conclusively discloses, as above shown, the existence of a large unobstructed expanse of highway ahead of the driver and on which plaintiff was walking; and from this the conclusion is inescapable that his obtaining such a timely vision of the pedestrian was prevented only by the excessive speed employed and a failure to exercise ordinary care and reasonable diligence.
In contemplation of law, therefore, Osterland is held to have seen plaintiff in time to have averted striking her; and, irrespective of her above-described continuing negligence, liability for the sustained damages results under the last clear chance doctrine.
The district court's award of $8,000 for suffering, pain, injury and loss of earnings appears to be correct in view of the circumstances hereinafter detailed. It finds ample support in the jurisprudence of this state.
At the time of the accident, plaintiff, a widow 38 years of age, was working in the capacity of a housekeeper for a Mrs. Crawford in Olla. For her labors she received board and lodging and, additionally, $8 per month. This totaled in value about $30 per month, and was her only income.
Examinations made on admission to a sanitarium at Olla, to which she was carried immediately after being struck, revealed various and numerous cuts and bruises over her entire body and multiple comminuted compound fractures of the left tibia and left fibula with projecture of the bones. Further, a flesh wound between 6 and 8 inches long existed on the left leg from which part of the tissue had been gouged out. Found also were a cerebral concussion to the formation of the skull in the right temporal region, a scalp wound on the left side in the temporal region, lacerated wounds on the heel and knee of the left leg, and evidence of hemorrhage in the cerebral spinal system. The attending physician, at the time of the examination, thought she would live only four or five hours.
Plaintiff remained in the hospital from the date of her admittance August 5, 1939, until September 11, 1939, when she was temporarily discharged. On several occasions thereafter, for short periods of time, she was readmitted. An open reduction operation was performed on her on November 5, 1939.
A report on plaintiff's condition, made by a physician of defendant's selection on June 21, 1940, or more than ten months after the accident, shows the following: "Examination reveals a swollen left lower extremity; the whole leg from the knee to the toes is swollen; there is an abnormal extension of the foot on the ankle; there is marked limitation of the ankle and knee joints; a dressing is worn on the upper third of the leg, which being removed discloses several discharging sinuses, which are on the inner anterior aspect of the leg over the tibia and close to a healed linear scar about 5 inches long, evidently and admittedly a surgical scar. There is a long oblique depressed scar on the back of the leg at a lower level, the appearance suggesting that the scar was made from external force and not from protruding bones as claimed by the patient; the leg is about one inch shorter than the sound member. X-ray films made in an anterior-posterior and lateral exposure show an old badly comminuted fracture of the upper third of the tibia, with an excess of callus formation, and union of the fracture, in the midst of which fragments and callus is a twisted orthopedic wire about two inches long, around which the union is faulty and shows signs of infection. The fibula fractured at about the same level, is slightly overlapped and not in a good position and though there is callus formation the union is not sound. There are several other healed scars on the lower and upper extremities of the body, which are not prominent and not very evident to the public gaze. In our opinion the surgical wire in the leg in the presence of infection is acting as a foreign body and should be removed, which operation should promote healing and shortening period of disability; the one inch shortening is permanent and beyond relief; use of the member should reduce the amount of limitation in the ankle and knee and use of the member gradually reduce the swelling in the leg and also correct the osteoporosis, or decalcification evident in the bones in the X-ray films, a condition which results from prolonged lack of use of the member. The amount of permanent disability can not be estimated at this time but eventually a useful member should result."
It is further disclosed by the record that much shock, pain and suffering were endured *Page 680 
by plaintiff as a result of the injuries; that her left leg was in a cast for nine months; and that at the time of the trial, held in the latter part of June, 1940, such leg was useless, and she could walk only with the aid of crutches.
With reference to the damages claimed for various expenses incurred, the trial court stated: "The fee bill filed in this suit is around $2663.00. In view of the testimony, we think this is a rather high fee, and that a fee of $2,000.00 for medical, nurse and hospital expenses would be a fair compensation."
This reduction from the claimed amount seems to be justified by the evidence. For instance the fee of $300 for the attending physician was listed separately and also included in the hospital schedule. One of those identical claims must be eliminated. Furthermore, a charge of $495 — 165 days at $3 per day — made by a sister of plaintiff for services as a practical nurse is undoubtedly excessive. The remaining items, for which payment is claimed, are adequately substantiated.
For the reasons above assigned the judgment is affirmed. *Page 684