ELLIS, Judge.
This is a suit for damages filed by the plaintiffs, William F. Dunn, Jr. and Leslie Conrad, as the result of a collision 'between a 1940 Ford convertible automobile owned and being driven by Conrad and in which Dunn was the guest passenger, and an alleged tank car, property of the defendant railroad company. The plaintiffs allege in their petition that on or about the 29th day of November 1947 at approximately 1:30 o’clock A.M. plaintiff Conrad was driving his Ford convertible automobile in a northerly direction along a public road known as the Lake Charies-West Lake Road; that the defendant’s railroad tracks consist of a main line track running east and west, a house track north of the main line, and a passing track south of the main line, forming a railroad crossing across the highway at the south edge of the town of West Lake, Louisiana in Calcasieu Parish; that as the plaintiff Conrad was driving northward and approaching this crossing, he brought his automobile to a stop, looked for the electric signal and listened for the bell warning of the approach or presence of trains or cars on said tracks, looked to the west to discover if any trains were approaching from that direction, then started across the railroad crossing and their vehicle suddenly approached and struck a stationary freight or tank car on defendant’s crossing which had been left there by defendant, its agents, servants or employees.
Defendants answered the suit denying any negligence and specifically alleged contributory negligence on the part of defendants.
There was judgment in the District Court in favor of the defendants and against both plaintiffs, dismissing their suit at their cost, from which judgments the plaintiffs have appealed.
It is the contention of the plaintiffs that on the morning of November 29, 1947 at about 1:30 o’clock A.M. they ran into a railroad car which they believe was a tank car which had been left on the track south of the main track, which will be hereafter referred to as the passing track, and that this car had been placed by the employees of the defendant company in such position on this track that the west end of the tank car protruded into the east lane of traffic on this roadway, and that the plaintiffs’ car ran into this tank car and, therefore, the accident took place in the passing track.
The defendants contend that the accident took place on the main line when the plaintiffs drove their automobile into a tank car which was across the highway and formed part of an 18 car train which had stopped in West Lake in order to do some switching, and that at the time of the accident the signal lights were burning and the bells ringing and that the accident occurred around 2:00 o’clock A.M.
The District ’Court in its written reasons propounded the proper questions necessary to a correct decision, and analyzed the case along those lines, which were stated as follows:
1. Was the object the plaintiffs ran into with their automobile on the passing track or on the main 'line at the time of the accident ?
2. At what time did the accident occur?
3. Were the signal lights burning and bells ringing at the time of this accident?
The evidence in this case shows that early in the night the plaintiffs, who were both veterans of World War II and members of the Veterans of Foreign Wars, had been practicing basketball at a gymnasium in West Lake, Louisiana until approximately 10:00 P.M., and that being members of a committee to secure a band for a dance of the V.F.W., they left the gymnasium and *332 proceeded to a night club called the “Yukon Club” where they were to meet someone with regard to securing a band. Being unsuccessful in their mission, they left the “Yukon Club” and went to the “Silver Star”, another night club, stayed there awhile and being unsuccessful left there and their last stop was at the “Manhatten Night 'Club,” which they say they left a little before or after 1:00 o’clock A.M., and they then proceeded on their way to West Lake which is a black topped road after leaving Highway 90. The plaintiffs as well as many other witnesses offered on their behalf testified that it was a foggy night, that they could see from 10 to 30 feet, and that the fog, of course, was thicker in the low places. We are not inclined to believe that there was quite as much fog as the plaintiffs and their witnesses contend, taking into consideration the testimony of somé disinterested witnesses in the case, that is, the two young men who testified on behalf of the defendant that they witnessed the collision and testified that they were able to see the train parked across the crossing without any trouble at a distance of 200 feet, and the fact that trainmen a distance of 14 or 15 car lengths, from 500 to 545 feet away, clearly saw the stop signal given by the switchman with his lantern. Be this as it may, we do not think it is too material to a decision in this case.
The plaintiffs further testified that the accident occurred at approximately 1:30 o’clock A.M. which, if true, would eliminate the defendant’s contention that it happened on the main line for the train which was occupying the main line at the time of the collision did not reach West Lake until slightly 'before 2:00 A'.M. It is proven by the plaintiffs that there was a tank car parked on the north or house track which protruded into the highway. However, as stated by the District Court, this fact is more or less immaterial as it is well established that the warning signals do not work for this track and it is not contended that the plaintiffs ran into this car, although it could be considered as tending to prove that if the railroad company carelessly and negligently left this car protruding into the highway on the north track, they might have been careless and negligent and left one protruding on the south trade. The fact that this car protruded in the highway is admitted by one of the defendant’s witnesses who was one of the train crew on that night. If the members of the train crew were going to willfully falsify on the trial of the case, this witness would not have admitted this obstruction on the north track. We do not believe that any of them testified falsely. In fact, all of the testimony can be reconciled except on the question as to the time the accident occurred.
Admitting for the sake of argument that it has been established by the plaintiff that the defendant company had so placed and left a tank car on the passing track that it protruded into the east lane of traffic from one to “four to six feet” as testified by a number of witnesses offered on behalf of plaintiff, this testimony of itself might lead to the conclusion that by reason of the tank car’s position it could have been the one with which the plaintiffs collided. Such proof alone would not be sufficient to establish the plaintiffs’ case, but the plaintiff then contends that in addition to the established fact that there was a car protruding in the highway on the passing track that there are certain physical facts testified to as having been found south of the passing track which definitely establish the collision as having taken place with this tank car protruding into the highway on the passing track.
It was testified 'by a mechanic employed by Bourlon’s garage of Lake Charles that he went to the scene of the accident between three and five o’clock A.M. in order to pick up plaintiff’s wrecked automobile; that he found this automobile located “between ten and twenty feet sitting off of the railroad track off to the left side of the road.” The railroad track referred to by this witness was the passing track. He was asked, “Did you have occasion to ’notice anything that was immediately south of the first track that you approached coming from a southerly direction?” The wit *333 ness answered, “Well, about all I noticed was a little dirt and glass scattered around between the car and the track.”
In addition to the mechanic’s testimony on thi-s point, the plaintiff offered the testimony of an employee of the Magnolia Petroleum Corporation who was also a Deputy Sheriff, who made an investigation the next day and testified that he saw some oil, dirt and glass within two feet south of the passing track, also the remains of a car headlight as well as a piece of grill, the latter being six feet 'south of the passing trade, and that he did not notice any debris north of the passing track. He also stated that he found skid marks about four feet in length south of the passing track.
Also, plaintiffs offered the testimony of State Trooper Simon who testified that the wrecked car was four or five feet south of the passing track, facing north and just slightly to the left of the center of the road, and that he noticed no debris or tire tracks between the south track and, the main track but that broken glass and oil were “right there,” meaning, as we understand, right where the car was located as stated above. He further testified that he saw no tire marks.
Sidney Broussard, the other State Trooper who was with Trooper Simon, testified that he did not know upon which track the collision took place but that the plaintiff’s wrecked automobile “was sitting on the west side of the highway, half on the shoulder and half on the west lane.”
Another witness on behalf of the plaintiff testified that he arrived at the scene approximately five minutes after two o’clock and that the wrecked automobile was facing north, south of the passing track, and it was just about in the center of the road. He also testified that he was unable to push the car off of the highway with a pick up truck, that it would not move.
Testimony was offered by the plaintiffs to prove that the accident occurred at approximately 1:30 A.M. or at least prior to the time that the 18 car train, which included the tank car that the defendant contends was the one with which the plaintiff’s automobile collided, reached West Lake. The plaintiffs fixed the time at approximately 1:30 A.M. and offered the testimony of a nurse, to the effect that she made emergency reports when the plaintiffs were admitted to St. Patrick’s Hospital in Lake Charles and that it is shown on these reports that the plaintiffs were admitted to the emergency room at 2:00 o’clock A.M., which would have been impossible had the accident happened at the time fixed "by the witnesses for the defendant. We have not referred to the doctors’ testimony as to their idea of the time they saw the plaintiffs in St. Patrick’s Hospital for it is totally misleading, being only an idea or an estimate which is shown by positive testimony of plaintiffs’ and defendant’s witnesses to be in error. Plaintiffs further rely upon the testimony of a taxi ca'b driver of West Lake, that the wrecked automobile was facing north, south of the passing track, and also the testimony of a passenger in the taxi cab which was returning to West Lake at approximately 2:30 o’clock • A.M. and who stated that she saw plaintiff’s wrecked car south of the passing track “on the side of the road” and “on the west side” of the road.
The above is a resume of the testimony depended upon by the plaintiffs that the collision occurred on the passing track.
On the other hand, the defendants show that a train crew of six men, viz., the engineer, fireman, engine switchman, switch-man, car inspector, and engine foreman in charge, reported for duty beginning at 11:40 P.M. on November 28, 1947. These men were in charge of a train composed of the engine, tender, and 18 cars, which was to leave Lake Charles, go to West Lake, pick up more cars and then go on to a place known as Rose Bluff where the defendant company interchanged cars with the K. C. S. Railroad. The evidence of the train crew is to the effect that they left Lake Charles between 1:45 and 1:50 A.M. on the morning of the accident and that it took them from five to ten minutes to make the trip from Lake 'Charles to West Lake; that upon their arrival there the train was stopped so that the tank car, which they testified was the one with which *334 the plaintiffs collided, being- UTLX-43584, was squarely across the road, with two. or three other cars of the train to the east of the highway. It is further shown that they were stopped on the main line for a period of from three to eight minutes prior to the collision, which, if they left at 1:45 A.M. would put the train across the crossing where the accident occurred at 1:55 A. m., and taking the shortest period of time, three minutes, would make the exact time of the accident at 1:58 o’clock A.M. Of course, if we take 1:50 A.M. as the time of the departure from Lake Charles, the accident would have 'been at three minutes past two, and if we take the longer period of time estimated that they were stopped prior to the accident, or eight minutes instead o-f three minutes, the accident would have happened at 2:08 o’clock A.M. In any event, the estimates given by the train crew were to the effect that this accident occurred within from 1:55 A.M. to 2:15 A.M. Taking the most favorable time of 1:55 A.M., it would have been impossible for an ambulance to have come from Lake Charles, a distance of five miles, and to have picked up the plaintiffs and taken them back to Lake -Charles to St. Patrick’s Hospital in five minutes or by 2:00 o’clock, the time the nurse testified they arrived at the hospital. We believe from all the pertinent testimony on this particular point that the nurse was in error.
There is no doubt that this 18 car train was stopped on the main line with two cars extending east of the .crossing, and the tank car identified by the number given above having its wheels • on the west end of the car at the edge of the west end of the highway, and the wheels of the east end of the -car at the east side of the highway, and the coupling between it and a car to the east at or near the edge of the highway. It is shown that the switchman, who rode over on the rear end -of the last or eighteenth car, was walking toward the crossing between the main line and the passing track, a distance of approximately 54 feet from the crossing, when he heard the automobile run into the tank car. He did not see it as there were cars to the south of him on the passing track, the direction in which the car was coming. He immediately, as he was walking toward the crossing, flagged a stop signal to the engineer, and upon seeing that the occupants of the car were injured, he turned, crossed between the car-s on the main track and went to the depot which was approximately 8 or 10 feet to the north of the main track and phoned for an ambulance. The engineer stopped the engine, which had only gotten a -car’s length further to the west as it had been uncoupled to go into the passing track to pull out some cars that had been previously placed there. The members of the train crew testified ■that the cars which were parked on the passing track were all we-st of the road and without the area, or a distance of more than 30 feet, that would cause the warning signals to operate. The switchman was approximately 13 or 14 car lengths from the engine at the time he gave the signal which was plainly seen and acted upon. The engine foreman in -charge of the train, immediately came to the crossing and the switchman returned from the depot at about the same time and heard him asking the plaintiff Dunn, who had just been helped out of the car by two young men, Knepper and Hindman, if he couldn’t have seen those signals working. Both testified that Dunn said he had not noticed and apparently the driver hadn’t noticed the warning signals, either.
As there was a train that left Lake •Charles at 2:40 A.M., it was necessary that the main line be cleared by the switch train by 2:35 A.M. and -for this reason the members of the train crew were anxious to get the automobile moved from under the tank car. The two young men, Knepper and Hindman, who appeared at the wrecked automobile immediately after the collision and who were there at the time the engine foreman got to the crossing, and when the switchman returned from the depot, testified that they were employed by the Nelson Truck Lines -of Lake Charles -but on that night were working in the marsh back of West Lake in connection with the laying of a pipe line, and that as they were due in Lake Charles at 3:00 o’clock A.M. to make a trip for their regular employer to Alex- *335 anclria, they had left the marsh at approximately 1:45, which would put them at the railroad station or crossing' at close to 2:00 o’clock A.M., and it was their opinion that the accident happened around 2:00 o’clock or shortly thereafter; that when they were within approximately 200 feet of the crossing they clearly saw that it was blocked by the train, whereupon the car was driven to within 10 or 20 feet of the crossing and stopped with its parking lights on to wait until the train moved. It was while so parked that they noticed the lights of the car loom up some 150 feet south of tire crossing on the black topped road. As the main line was raised, they could see the plaintiffs’ car approaching underneath the tank car, and when it was within about 50 feet they could see the front part of the car. It is their testimony that the plaintiffs’ car was going at a moderate speed but that it did not slow down and struck the tank car approximately in the center of the road. Within a matter of seconds or as soon as they could recover their wits, they went to the east side of the highway and climbed between the car which the plaintiff struck and the car coupled to it to the east. When they got there there was no one in the car except the plaintiffs, both of whom were inside the car. The switchman had merely gone to the car and glanced in and left to make the phone call for the ambulance prior to the time these two witnesses arrived.
In order to move the plaintiffs’ car from under the tank car, the witness Knepper agreed to bring his car around from the north side and pull plaintiffs’ car out, but at the time he arrived with his car, some members of the train crew, together with the witness Hindman, had pushed the car from under the tank car and south of the passing track and to the left side of the road. However, a portion of the car must have still been in the west or south bound traffic lane as the driver of the ambulance particularly asked the two young men to try and get the car completely off of the highway so that no one else would run into it. This was later attempted with the pick-up truck but it was unable to move the car. It was shown that it did back up and bump the car several times in an effort to move it and if there was anything broken or loose on the car it certainly seems that it would have fallen from the car to the ground at that time. It was also testified by Knepper that Dunn, one of the plaintiffs, called him two or three weeks after the accident and asked him about it and he told him what he knew. This is not disputed and we can only presume that he told him at that time what he testified, to, else Dunn would certainly 'have testified to that effect.
Knepper testified that he did not remember whether the warning signals were working or not when he drove up and parked at the crossing; that he had had no trouble in seeing the tank car on the crossing at quite a distance and just couldn’t remember seeing or hearing the signals. The other witness, Hindman, who was in the car with him, clearly remembered the red lights working hut did not remember whether or not the bell was ringing.
Another member of the train crew who saw the wrecked automobile of plaintiff against the tank car approximately in the center of t'he road was the engine switch-man who testified also that there was some dirt and glass on the ground where the automobile struck the tank car. The switchman also testified that he saw some glass in the road at the point of collision, as did the car inspector who inspected the tank car to see what damage had been done to it.
In order to hold that the plaintiff’s automobile did not strike the tank car on the main track we must say that six members of this train crew and the two purely disinterested witnesses, Knepper and Hind-man, who actually saw plaintiff’s car when it ran into the tank car at a distance of from 10 or 20 feet and who knew the plaintiff Dunn, were all unmitigated falsifiers. There is no reason to believe such, in fact, their testimony is stamped with truthfulness and is not in conflict on any material point with the testimony of plaintiffs’ witnesses, for it must be remembered that no witness for plaintiffs testified, other than the plaintiffs themselves, as to where this accident actually happened or that they *336 saw it. The plaintiffs’ memory of the accident is hazy and justly so, as 'both were injured to such an extent that it would be reasonable that their memory from the time of the actual collision of what happened would not be too good.
The members of the train crew all testified that the lights were working, and the remark which the engine foreman testified he made to Dunn with regard to the lights and bells and why he couldn’t see them, at the same time pointing to them, was most natural and is not subsequently thought of testimony.
Plaintiff’s contention that the accident happened on the passing track must yield to the positive eye witness testimony of the witnesses for the defendant. Therefore, we conclude that the accident happened on the main line and not on the passing track.
As to the physical facts which counsel for plaintiff contends contradict defendant’s positive testimony, we are of the opinion that this car was definitely pushed from under the tank car on the main crossing, south along said highway and south of the passing track with part of the car on the shoulder and part in the west or south bound traffic lane and facing north. We believe that when this car was pushed that this dirt, glass, oil, etc. south of the passing track was at that time dislodged. Certainly, the collision would not have occurred at the point the witnesses located the wrecked automobile south of the passing track or at the point where the debris was found 'between the car and the passing track. We say this for the simple reason that the theory of plaintiff’s case is that a car on the passing track protruded in the east or north bound lane of traffic a distance of from one to, say, six feet, and that the plaintiffs struck this car. The position of the wrecked car as testified to ■by the various witnesses varied. Some testified it was approximately in the center of the road but the majority testified that it was to the left of the center of the road. All placed the debris immediately in front of the car and between the car and the passing track. We believe from the testimony that the car was partly on the shoulder and partly on the highway to the west, facing north. Let us assume that they struck a car protruding one foot in the highway - on the passing track. There is no explanation given or attempted as to how this car then could have gotten across the center of the highway, slightly to the south of the passing track, facing in a northerly direction with the debris in front of it and no debris where it struck the protruding car. Assuming that the car protruded six feet into the 'highway, still the position of the wrecked car and the debris is entirely inconsistent. The physical facts fit in with the positive testimony of the crew members and with Knepper and Hind-man that they pushed this car from under the tank car on the main line, south across the passing track and slightly to the west side of the road. For the car to have struck a tank car on the passing track which protruded 1 or 6 feet into the east lane of traffic and to have come to rest from distances estimated by the witnesses at 4 to 20 feet south of the south line of the passing track, it would have had to travel at right angles to the point of impact or at least sideways in a southwesterly direction, when at the time it was travel-ling in a northerly or slightly northwesterly direction. In other words, we cannot see how it could have been possible for the plaintiff’s car to have collided with a tank car on the passing track as contended by the plaintiffs, and then come to rest almost directly across the road and a distance of 4 to 20 feet south of the south line of the passing track.
We are unable to reconcile the fact that defendant’s witnesses moved this car by pushing it after the collision although the pick-up truck could not do so. Of course, it is possible that the automobile was put in gear after it had been pushed to this point and no one thought to take it out at the time the truck was pushing on it, or it could be that the emergency brake had been pulled up on the car if it had one, or that the front wheel had rolled that far and given way. There is no testimony to explain it but we do not doubt the positive testimony to the effect that it was moved to its final resting place south of the passing track by two of the trainmen *337 and the witness Hindman, and a small amount of assistance was given by the witness Knepper who saw them pushing the car.
As to the hospital record made by the nurse that the plaintiffs were admitted in the hospital at 2:00 o’clock, we agree with the trial judge that the time given is inaccurate, and it could not ‘be accurate in the face of the positive testimony that the accident happened on the main line and was seen by eye witnesses whose testimony as to the time the collision occurred of necessity renders the time as recorded by the nurse inaccurate.
As to whether the lights were working at the time of the accident, we have the testimony of witnesses for the plaintiff that they had, on many occasions, seen a car on the passing track within the area which should have caused the lights to flash on and the bells to ring and that neither the lights nor the bells worked. It was also testified to ¡by many witnesses for the plaintiff, and positively so, that on January 12, before the trial ended, that a car had 'been left on the passing track within 18 feet of the highway and that the lights failed to flash and the bells failed to ring. The distance for the lights and bells to work was within 30 feet of the highway. They further testified that a train came by on the main line at the time they saw this car within 18 feet of the crossing on the passing track and that the warning signals all came on and worked but that it was not until a switchman of the defendant company threw the switch that they began to work for the passing track.
The plaintiffs offered no testimony by any witness that they ever saw the warning signals fail to work when a train approached on the main line and got within the area within which they were supposed to operate. The only testimony to this effect in behalf of the plaintiffs was the testimony given by the plaintiffs themselves that on the night of the accident they did not see any lights or hear any bells. While we are accepting the testimony of plaintiffs’ witnesses as given with regard to cars parked upon the passing track, still I would say that the plaintiff has not proved in the face of other testimony that the signals were not working on the night of the accident when the plaintiffs’ automobile struck the tank car on the main line. We have the positive testimony of the members of the train crew that the signals were working, as well as the testimony of the witness Hindman that the lights were working and of the taxi cab driver that he heard the bill ringing on the night of the accident and the testimony of the mechanic who picked up the wrecked car between 3:00 and 5:00 A.M. that while he was there a train passed on the main line and the lights flashed and the ball rang, and in the absence of any testimony of any witness that they ever knew of the failure of the lights to flash or bell to ring when a train passed on the main line, we take it as proven that the warning signals were working on the night of the accident and that Conrad, the driver of the car, as well as Dunn, the passenger, should have seen these lights. We are of the opinion that it was not so foggy that they could not see the warning lights flashing and their •failure to do so and their failure to use even ordinary care in proceeding across the track bars the plaintiffs from recovery.
It is accordingly ordered that the judgment of the District Court be affirmed.
J. CLEVELAND FRUGE, J., sitting ad hoc.