HARDY, Judge..
This is a suit in which plaintiffs, husband and wife, claim recovery for property damages and expenditures by the husband and *140 physical injuries sustained by the wife in an automobile-train collision in the City of Monroe, Ouachita Parish, Louisiana. After trial there was judgment in favor of defendant rejecting plaintiffs' demands, from which plaintiffs have appealed.
The accident occurred about or shortly before 8:30 A. M. on the morning of February 14, 1951, at the intersection of Adams and North Sixth Street in the City of Monroe. Plaintiff, Mrs. Hanks, driving a Buick Sedan belonging to the community between herself and her husband, accompanied by her two children and her mother, en route to take the older child to school, was driving her car south on North Sixth Street, which is designated as a privileged or right-of-way street under appropriate ordinance of the City of Monroe. At the intersection of Adams Street defendant railroad maintains two spur or switch tracks which are located on Adams Street and which cross North Sixth Street in an east and west direction. The train consisted of some four or five boxcars which were being pushed in a westerly direction by a diesel locomotive unit along the northernmost track, in the process of switching operations. Mrs. Hanks drove her car upon the track immediately in the path of the lead boxcar, without observing its approach, and her car was struck full on the left or east side thereof. The train before being brought to a complete stop pushed the Hanks’ automobile some 15 feet to the west where it collided with a telephone or utility pole situated immediately adjacent to the curb line of the street. As the result of this collision the Hanks’ car sustained substantial damage and Mrs. Hanks allegedly suffered the injuries for which she here claims compensation.
At the time of the accident both the automobile and the train were moving at a moderate rate of speed, that of the car being something in the neighborhood of 20 miles per hour and that of the train, according to various estimates, somewhere between 4 and 11 miles per hour. At the northeast corner of the intersection stands a building which was at the time occupied and used by a “drive-in” cafe and which structure unquestionably obstructs, to some degree, a view of defendant’s trains to the east, on the part of drivers of vehicles proceeding south on North Sixth Street. However, we note' that the building is some 30 feet, more or less, to the north of the spur track of the defendant which is involved in this accident.
Plaintiff’s specifications of negligence as against defendant’s employees are set forth in allegations that the freight car was being backed into the intersection of North Sixth Street silently and quietly without signals, warning bells or lights; without any acting or regular flagmen, and, generally, without any warning whatsoever of its approach, thereby endangering those attempting to traverse North Sixth Street. On the basis of these allegations of negligence plaintiff concludes that defendant’s operation was in wanton disregard-of the safety of the traveling public. It is further noted in connection with plaintiffs’ petition that they allege the maintenance by defendant of what amounted to a “death trap”. However, no effort appears to have been made to develop this specific charge nor is there any insistence upon such contention on behalf of plaintiffs.
Defendant denies any negligence and affirms the contributory negligence on the part of the plaintiff, Mrs. Hanks.
Distinguished counsel for plaintiffs in brief has well delineated the question before us in these words:
. “It is the burden of appellant’s case that the railroad was grossly negligent in its treatment of that backward switching movement and in its failure properly to protect that crossing.”
Trial of the case developed some violent and irreconcilable conflicts of testimony, particularly with respect to the point as to whether adequate precautions were taken by the defendant railway company. We advert to a summary of the testimony of Mrs. Hanks, the driver of the automobile involved. According to the version of the accident as given by Mrs. Hanks, she was driving at a moderate rate of speed, some 20 miles per hour, more or less, and as she approached the railway crossing the driver of a car which was immediately preceding her vehicle signaled for a left turn or stop, *141 and, almost immediately", made a left turn from North Sixth Street to the east on Adams Street. Mrs. Hanks further testified that she brought her car to a complete stop at a point which she estimated to be approximately one car length north of the railway track; thereafter she proceeded upon the track, and was struck by the boxcar. The witness further testified that at the time she was looking straight ahead; that there were no flagmen' present at the crossing, and that s.he did not see the boxcar until it struck her automobile.
Proceeding to a determination of the ■questions of fact with relation to the ■charges of negligence made against defendant, we find first that the warning bell on the diesel engine was ringing during the entire time the train was engaged in the backing operation. This fact we think is conclusively established by the testimony •of the engineer, members of the train crew and some outsiders, disinterested witnesses. As against the existence of this fact we accept the testimony of Mrs. Hanks to the ■effect that she did not hear any bell, and we further take into consideration the point that the position of the bell was some 150 to 175 feet removed from the end of the train which 'actually struck the Hanks automobile. No attempt was made to establish the existence or operation of any other sound warning device or signal. And it is further evident that there were no extra crossing precautions in the nature of electric signals, nor lights or .bells, a permanent flagman, nor any sort of barricade designed to be lowered in warning of the approach of a train. In this connection it is pertinent to observe that the crossing is not occupied by main line tracks but is a simple grade crossing traversed by the spur or switch tracks hereinabove described, which are •used irregularly, according to the testimony, •sometimes several times a day and at other times not at all for several days. But the crossing is marked by a standard permanent railroad crossing warning post, its existence is known, and, according to her testimony, was known by Mrs. Hanks who was accustomed to traversing this particular street.
Another fact which bears upon the allegation of negligence on the part of defendant has to do with the contention that the situs of the accident is in fact a blind crossing by reason of the obstruction to the view resulting from the existence of the building on the northeast corner thereof. In this connection we have found very helpful the testimony of the civil engineer and the photographer and the exhibits prepared by these witnesses on behalf of the defendant. In her course along North Sixth Street Mrs. Hanks was driving in approximately the center of the street in order to clear cars parked on the west side thereof. North Sixth Street is some 27 feet in width from curb to curb at the point and it is rather accurately established that Mrs. Hanks’ position in her car as driver at the time must have been approximately 1 foot to the right or west of the center line of the street. Using this position at fixed stations of 5 foot intervals from a point 10 feet north of the railway track upon which the collision occurred, the expert witness, a civil engineer, computed the distance of vision from these several stations toward the east along defendant’s track. We set forth below the resulting table, giving first the distance of the station north of the track and next the perspective of view to the east. This testimony was supported by photographs and its accuracy was not attacked:
10 feet . 2,000 feet
15 “ 2,000 “
20 “ . 2,000 “
25 “ 900 “
30 “ .■. 700 “
35 “ 300 “
40 “ ...;. 123 “
45 “ ...:. 83 “
50 " .-. 65 “
60 “ 50 “
65 “ 45 “
70 “ 43 “
75 “ ...'. 40 “
' 100 « . 331/2 “
It is obvious from a consideration of these figures that the angle of vision decreases sharply at points 35 feet and more north of the track. But in view of Mrs. Hanks’ testimony that she came .to a complete stop within an automobile length north of the track it conclusively follows that at the time *142 she had a full and unobstructed view of the approaching train from the east if she had looked.
The only other factual proposition which hears upon this particular question is the violently disputed point with respect to the presence of flagmen at the crossing. Mrs. Hanks and her 13-year old daughter testified unequivocally that they looked ahead as the car approached the tracks and there were no flagmen present. Their testimony was supported by other witnesses who swore that they did not see any flagmen on or near the tracks immediately before the collision. Opposed to this testimony the defendant presented as witnesses three-members of the train crew and several outsiders, all of whom testified positively not only as to the presence and location but also as to the actions of the members of the crew who were engaged in flagging operations. This sharp conflict of testimony necessitates a finding of fact on our part in favor of the preponderating contention. After careful examination we are firmly disposed to the conclusion that the crossing operation of the train at aiid immediately before the' time of the collision was being protected by the services of flagmen, which finding we are happy to observe concurs with that of the district judge. '
Under our appreciation of the facts established,, as the train approached the intersection it was staffed by an engineer, fireman and three switchmen or flagmen. The engineer was in the.cab on the right or north side of .the diesel, locomotive but was too far removed from the scene to actually observe , the approaching Hanks automobile. The fireman on the opposite side of the' cab, o.f course, was blocked from any view .of the developing collision. -One of the flagmen,, or switchmen, Will Holmes, testified that he took up his position at a point in or near the 'middle of the intersection between the two spur tracks for the purpose of flagging traffic on North Sixth Street approaching the track from either direction, and that he was so engaged immediately prior to and at the time of the collision. Walking some five feet ahead of the boxcar which -was entering the intersection was another brakeman, one Lazrius Williams, who was performing the double duty of flagging southbound traffic on North Sixth Street with one hand and signaling to the engineer with the other. This witness testified that he observed the approach of the Hanks’ car; that both he and Holmes were attempting to flag its movement; that as soon as he observed that the driver was not going to stop in time to avoid a collision he immediately signaled the engineer with a “washout” or emergency stop signal, at which time the witness was actually forced to jump back to the east in order to avoid being run into by the. Hanks car. At a point about midway between Williams and the locomotive engineer a third brakeman was posted, whose duty admittedly was to relay signals from Williams to the engineer and which duty he testified he performed. However it appears that .the engineer did not rely upon" thereby since Williams was in clear view and he received the emergency stop signal directly from Williams and complied therewith by immediately applying the emergency air brakes. Still another employee pf defendant was present in the vicinity, one James Filhiol, who was employed as a porter or car check and therefore was not directly a member of the train crew. However Filhiol not only corroborated the facts above mentioned with respect to the position of the members of the train crew but additionally testified that he.made the effort to aid in flagging operations by walking out into the intersection toward the position occupied by Holmes. Filhiol also testified that when it became apparent that the flagging signals made iby Holmes and himself were ineffective, that he was forced to jump out of the way of the approaching automobile, being fearful that it would strike him.
From these facts we must determine the question of negligence as charged against the defendant railway company.' Unquestionably the law imposes a degree’ of care upon railway operators with respect to the'protection of crossings which is directly in proportion to the danger and hazard of the crossing itself. In other words, we think it is clearly established *143 that much greater care and protection m the operation-and movement of trains is required with respect to crossings in or near populous communities than in what is properly designated as open country. It follows that the crossing of a busy, heavily traveled city street, as in this instance, imposes the burden of a high degree of care and caution on the railroad. Additionally the existence of other facts such as obstruction to view, as is here present, but serves to increase this degree of care.
Under the facts- what were the precautions that were being taken and were they sufficient in view of surrounding conditions and circumstances to absolve the defendant of the charge of negligence? The determination of this question is of material importance. First we observe that in the absence of any statute or law imposing such responsibility we do not think a mere failure to maintain special warning signals and protective devices at a street crossing in itself constitutes negligence. Washington v. Yazoo & M. V. R. Co., 11 La.App. 635, 124 So. 631; Eggleston v. La. & A. R. Co., La.App., 192 So. 774.
By way of audible warning signals it appears that the bell of the locomotive was being sounded continuously, which sound was perceptible in the immediate vicinity of the actual crossing. As an additional precaution the train was moving at a very slow rate of speed, which would permit it to be brought to a stop, according to the testimony of the engineer, within a distance of some 7 or 8 feet. That such an effective stop was actually made is indicated by the fact that the car was pushed only a total of some 15 to 18 feet to the west across the street and into the post near the curb. Considering the period in which the brakes were actually taking hold after the slack between cars was absorbed, it is obvious that the estimate is reasonably accurate. In addition, we note that there is no evidence that the right side of the Hanks automobile which came to a rest against the utility pole was damaged to an extent which would have resulted from a violent impact at a high speed. Finally, one employee was giving his complete attention and effort to the flagging of traffic approaching the crossing and two other employees were assisting in this endeavor.
On the whole we are constrained to feel that these combined precautionary measures adequately complied with and fulfilled the, requirement and burden of unusual care imposed upon the railroad by virtue of the increased hazard and danger arising from the particular operation. Under the facts we find that plaintiffs have failed to sustain.their charge that defendant was negligent, in its operation of the backward switching movement and its failure to adequately protect the crossing. ' ,
While the above finding in itself is sufficient to dispose of the matter before us, we think its effect will be made more conclusive by consideration of the allegation of contributory negligence which has been made by defendant.- Therefore conceding, only for the sake of - argument, some negligence on the part of defendant we proceed to a discussion of the existence of contributory negligence on the part of the driver of plaintiff’s car, Mrs. Hanks.
The salient facts as established by the ■ testimony of this plaintiff are that she brought her automobile, to a complete stop only a car length, more or less, (let us say, some 10 to 20 feet) from the track and then proceeded to-attempt to negotiate the crossing; that she looked straight ahead and did not see the flagmen; that’ she looked to her left, that is, to the east, and did not see the approaching train, but that her car was struck broadside as soon as it reached the defendant’s track. The testimony shows that - the height of a railway boxcar is 14^4 feet. As a matter of common knowledge we are all generally familiar with the size of a freight car and must take cognizance of- the fact that an approaching object of this size in close proximity is readily and easily perceptible to view.- Even the most 'casual glance in the direction of its approach would have served to disclose its presence *144 to the driver of a vehicle who was at the time only a comparatively few feet away, for it is obvious, under the facts as testified by plaintiff, which we have above recapitulated, that if and when she brought her car to a stop within a distance of 10 to 20 feet from the tracks before proceeding across the track intersection that at such time the boxcar, even if it were traveling at the maximum estimated speed of 11 miles per hour, was within some IS or 20 feet of the point where the impact actually occurred. It is also worthy of comment, with reference to the table of distances of view hereinabove set forth, that from a point 20 feet north of defendant’s track the plaintiff driver had a clear view tó the east of some 2,000 feet. In other words, the building on the northeast corner of North Sixth Street, which is strenuously urged on behalf of plaintiffs to have been a complete obstruction to the view, had absolutely no interference with view from the point fixed.
Now let us turn to a consideration of still another set of facts. Let us completely disregard plaintiff’s testimony that she brought her vehicle to a stop at the point asserted, and let us accept the testimony of other witnesses, members of the train crew, which directly controverts the testimony of the plaintiff, Mrs. Hanks. These witnesses testified that the Hanks’ automobile approached the crossing from the north at a speed of approximately 20 to 25 miles per hour; that the driver did not stop nor slow her speed; that immediately before reaching defendant’s track the witnesses observed the driver looking down and to her right, that is, away from the direction of the approaching train; that at least two of the witnesses were forced to jump aside from the path of the approaching car; that as the front assembly of the automobile reached the track the driver looked up and to the left, perceived the boxcar almost at the immediate moment of the collision, and brought her car to a stop in this position on the track. It was further testified that as soon as the lead brakeman, Lazrius Williams, who was proceeding across the. street only a few feet in advance of the boxcar, perceived that the driver of the automobile was not going to stop and was not observing the approach of the train, he signaled the engineer for an emergency stop and almost at the same moment jumped back to avoid being run down by the automobile. On observing the signal the engineer applied the emergency brakes, which must have been done approximately at the instant of collision. Accepting the testimony of the engineer that the brakes, would have brought the train to a stop within some 7 or 8 feet, and making allowance for the distance which would have been traveled by the train while the slack was being taken up, and before the brakes took effect, we think the actual estimate of the distance the automobile was pushed by the train from its position about in the center of the street up against the telephone pole just inside the west curb, a distance of approximately 15 feet, accords with all the facts.
Summarizing the conclusions which must be logically deduced from the variant and opposite sets of facts established by the two lines of testimony noted, there can remain no question as to the serious negligence, of the plaintiff, Mrs. Hanks. If her version of the accident is accepted she was grossly negligent in proceeding from a place of safety immediately into the path of the approaching train which was clearly visible by even the most cursory inspection, and she was grossly negligent in failing to see what could and should have been seen. If, however, we reject the testimony of this witness and accept the testimony of. defendant’s witnesses, it remains equally conclusive that this plaintiff was grossly negligent in driving onto defendant’s track in the path of an approaching train which she could and should have observed at a considerable distance before her vehicle actually reached the track itself. Reference to accepted calculations on stopping distances demonstrates that an automobile traveling at 20 miles per hour can be brought to a stop within a distance of 37.7 feet, which includes both the reaction and the net braking distance. An automobile traveling at 30 miles per hour can be. brought to a stop in 68.3 feet, which *145 includes both reaction and net braking distance. The effect of these mathematical considerations leads to the conclusion that at the time the Hanks’ automobile was 70 feet north of the track, within which distance it could have been brought to a stop even if traveling at 30 miles per hour, (44 feet per second) the distance of view of the driver to the east was 43 feet, and the train traveling at 11 miles per hour (approximately 16 feet per second) was at this time' within approximately 26 feet of the point of impact, that is, it was well within the 43 foot view of the automobile driver.
It is obvious that these figures are predicated upon the acceptance of that testimony which is most favorable to plaintiff’s contentions. Indeed we have even exceeded the widest range of the testimony by making the above computations upon the basis of a speed of 30 miles per hour, which is nowhere justified in the record since the maximum speed, even approximated by any witness, was 25 miles per hour. Of course, it is clear that as the speed of plaintiff’s car is reduced by that much greater degree is the negligence of the driver rendered more obvious. It is conclusively established by our jurisprudence that the driver of a motor vehicle is held to see that which could and should have been seen. Plaintiff’s counsel has well observed:
“If Mrs. Hanks had seen the train this accident would not have occurred * *
Every consideration in the instant case, whether it be viewed from the standpoint of the testimony of the witnesses for plaintiff or defendant, leads inevitably to the conclusion that Mrs. Hanks could and should have seen the approaching train well within the time and distance necessary to avoid the collision. It is well established by our jurisprudence that the driver of a motor vehicle in negotiating a railway crossing is burdened with thfe responsibility of "seeing and hearing that' which might and could have been seen and heard, and further, that he is required to use such care as is commensurate with the existing danger. Matthews v. N. O. Terminal Co., La.App., 45 So.2d 547; Frederick v. N. O. Terminal Co., La.App., 46 So.2d 353; Dunn v. Texas & N. O. R. Co., La.App., 44 So.2d 330. It follows that Mrs. Hanks’ negligence in this respect, under the facts of the instant case, was the sole, direct and proximate cause of the accident.
Finally, it is contended on behalf of plaintiffs that despite any contributory negligence on the part of the driver of the Hanks’ automobile, the doctrine of last clear chance or discovered peril is applicable. We are in complete and irreconcilable disagreement with this contention, since in our opinion the doctrine has no possible application under the facts of this case. Parenthetically, we note that plaintiffs did not plead the last clear chance but the principle is urgently pressed on appeal.
We accord with the contentions of counsel for plaintiffs that defendant’s locomotive engineer did not see the automobile at the time it immediately approached the track. It necessarily follows that he could not observe it as being in a position of peril. The other employees of defendant saw nothing in the nature of the approach by the automobile which would indicate that the driver had no intention of stopping before reaching the track. Indeed, it was only at the last moment when they were themselves in jeopardy of being run down by the car and when they perceived the driver was not observing the approach of the train that they were impressed with the danger of the collision. ' In response to this perception of danger everything possible was done to avert a collision, which efforts were unavailing.
We willingly concede the merit of the contention of plaintiff’s counsel with respect to the general proposition of law that the last clear chance doctrine applies despite the fact that a plaintiff’s negligence.-continues up to the moment of the accident. But we are firmly.committed to the proposition .that the applied *146 tion of this doctrine depends upon the defendant’s superior knowledge of the peril and his ability to avoid the injury. Rottman v. Beverly, 183 La. 947, 165 So. 153.
In the instant case there is not the slightest showing of any superior knowledge on the part of defendant’s train crew. The only knowledge of danger came at the last instant when defendant’s brakeman observed that the driver was not going to stop. At this time it was evident that defendant’s employees were not possessed of the ability to avoid the accident. Members of a train crew are not negligent in assuming that the operator of an automobile approaching the tracks will bring the vehicle to a stop, and there is no negligence even, when they persist in such a reasonable belief until it is no longer in their power to avoid the accident. Bordenave v. Texas & N. O. R. Co., La.App., 46 So.2d 525.
For these reasons there is no'basis for relief under the theory of last clear chance or that of discovered peril.
For the reasons assigned the judgment from which appealed is affirmed at appellant’s cost.